**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 12, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

JOHN DEPAULA,

     Plaintiff - Appellant,

v.

EASTER SEALS EL MIRADOR, a
corporation,

     Defendant - Appellee.

No. 16-2068

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. 1:14-CV-00252-MCA-SCY)**
_____

M. Karen Kilgore, Cuddy & McCarthy, LLC, Santa Fe, New Mexico, appearing for
Appellant.

Luke A. Salganek (Paula G. Maynes, with him on the brief), Miller Stratvert, P.A., Santa
Fe, New Mexico, appearing for Appellee.
_____

Before **MATHESON**, **PHILLIPS**, and **McHUGH**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

     Plaintiff-Appellant John DePaula appeals from the district court's order

granting summary judgment in favor of his employer, Defendant-Appellee Easter

Seals El Mirador ("ESEM"), on Mr. DePaula's various employment discrimination

claims arising from his termination.  ESEM showed that it fired Mr. DePaula due to

its financial condition and his performance issues.  Mr. DePaula could not rebut these

reasons or otherwise show they were pretextual.  Exercising jurisdiction under 28

U.S.C. § 1291, we affirm.

## I.  **BACKGROUND**

### A. *Factual History*

We present the following facts in the light most favorable to Mr. DePaula, the

non-movant, unless contradicted by the record.  *Birch v. Polaris Indus., Inc.*, 812

F.3d 1238, 1251 (10th Cir. 2015).[1]

ESEM is a nonprofit New Mexico corporation that provides services and

facilities for developmentally disabled adults.  Mr. DePaula worked at ESEM for 22

years, from August 1990 until June 2012.  In 1994, he was promoted to Deputy

Director of Programs and/or Clinical Services and oversaw several aspects of

ESEM's operation.  For 21 of his 22 years with ESEM, Mark Johnson, ESEM's CEO,

was Mr. DePaula's direct supervisor.

---

[1] *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell
two different stories, one of which is blatantly contradicted by the record, so that no
reasonable jury could believe it, a court should not adopt that version of the facts for
purposes of ruling on a motion for summary judgment.").

1. **Supervision by Mr. Johnson**

Between 2009 and 2010, Mr. DePaula received several memoranda from Mr. Johnson that documented and summarized conversations between them about Mr. DePaula's performance.[2]

Each memorandum expressed Mr. Johnson's disapproval of Mr. DePaula's performance, leadership, and treatment of particular employees. The memoranda noted persistent problems "that apparently have been f[e]stering for a long period of time" and that required Mr. Johnson to "continually intervene to solve day to day programmatic operational issues."[3] App. at 604-05. They also provided specific performance suggestions and expressed disapproval that Mr. DePaula had not implemented them. For example:

> [T]hese are some specific examples of how I need you to take a stronger, more organized leadership role. I cannot continue to have resolutions to

---

[2] Mr. Johnson's memoranda also stressed the support Mr. Johnson and ESEM had provided to Mr. DePaula and his management decisions over the years. For example, Mr. Johnson recapped the flexibility, support, and paid leave he gave to help Mr. DePaula through personal struggles. And he outlined the support and advice ESEM provided Mr. DePaula in dealing with a particular ESEM employee.

[3] In one memorandum, Mr. Johnson explained that the listed problems were "issues [given] as examples of the symptoms of problems that apparently have been f[e]stering for a long period of time." App. at 605. In another memorandum, he told Mr. DePaula:

> I told you that my concerns with the health and status of the Program and Clinical operations are growing. I am not willing to continue to work whereby I have to continually intervene to solve day to day programmatic operational issues.

*Id.* at 604.

issues be delayed, as it seems to have been becoming a pattern with your approach to problem solving.

*Id.* at 609. Mr. Johnson repeatedly told Mr. DePaula these changes were essential to Mr. DePaula's success at ESEM.[4]

2. **Pay Raises and Deduction**

Mr. DePaula received a "onetime bonus of $4,000" in June 2009 and a "onetime leave payout for non[-]used accrued leave in the amount of $2,100" in September 2009. *Id.* at 762. He also received a $12,000 "wage increase" in June 2010, made retroactive to July 2009. *Id.* at 763.

In March 2012, ESEM deducted $8,000 from Mr. DePaula's pay to compensate for a Civil Monetary Penalty ("CMP") incurred by ESEM in November 2011 due to Mr. DePaula's failure to submit a timely report to the Department of Health ("DOH"). Mr. DePaula took "ultimate responsibility for the late filing." *Id.* at 757.

---

[4] Mr. Johnson advised Mr. DePaula that his "behavior [was] impeding upon [his] ability to be successful. We need to have a positive trustful relationship which I believe has been challenged as a result of your perceptions about what has occurred." *Id.* at 608. He later stated: "Your choice is either to positively embrace this approach [regarding suggested performance changes] or to find employment else where [sic]." *Id.* at 609. He concluded:

> I will not continue to work with a negative, distrustful attitude . . . . It sounds like you don't want to be here, so you need to tell me what you want to do, as we can't continue to work like this and be successful. We need to have a positive trustful working relationship and this depends on you changing your perceptions about what has happened.

*Id.* at 610.

3. **ESEM's Financial Difficulties and Hiring Ms. Romero**

In 2012, ESEM was experiencing financial difficulties, including "cash flow" problems due at least in part to late incoming checks and reimbursements. *Id.* at 817. In response, ESEM focused on operations, cutbacks, and "positions having to be left empty." *Id.*

In January 2012, the non-profit Foundation of Knights Templar ("FOKT") contributed $150,000 to ESEM. FOKT's mission includes supporting ESEM, which it may do through financial contributions—though it is not "obligated or required" to do so. *Id.* at 307.

Also in January 2012, Mr. Johnson hired Patsy Romero as ESEM's Chief Operating Officer. She was charged with implementing cost containment measures.

At an April 19, 2012 meeting, Mr. Johnson assured senior management that ESEM was in a better financial position "than other providers who are now taking a $2 million loss." *Id.* at 818. But he also stated ESEM was "breaking even," the next year would be a "rebase year," and ESEM would have to "find a way to spend creatively, to get rates up, perhaps by spending in the latter part of the fiscal year." *Id.*

4. **Relationship with Mr. Quintana**

In 2011, ESEM employee Ken Quintana became Incident Manager, a position responsible for providing investigation reports to the DOH. Until December 2011, Mr. DePaula supervised Mr. Quintana. During Mr. DePaula's supervision, Mr. Quintana was diagnosed with cancer.

When Ms. Romero was hired in January 2012, she began supervising Mr. DePaula and Mr. Quintana. Mr. Quintana claimed Ms. Romero treated him badly as a response to the leave he needed to care for his cancer. He emailed Mr. DePaula "at least five emails . . . complaining about" Ms. Romero's interactions with him. *Id.* at 756; *id.* at 777-84. Mr. DePaula attested that he "talked to" Mr. Johnson and ESEM's Human Resources ("HR") department about Mr. Quintana's complaints, "tr[ying] to protect" him. *Id.* at 756. Mr. DePaula also helped Mr. Quintana with his reports to mitigate Ms. Romero's disapproval of Mr. Quintana's work product. Once Ms. Romero learned of this assistance in December 2011, she instructed Mr. DePaula to stop.

5. **Mr. DePaula Changes Positions**

A third party monitoring company evaluated ESEM and advised that Mr. DePaula did not have the clinical credentials to continue as the Deputy Director of Clinical Services. In response, in March 2012, Ms. Romero moved Mr. DePaula into the position of Risk Manager/Incident Manager/Director of Risk Management. His salary was not decreased.

6. **Mr. DePaula Takes FMLA Leave**

Shortly thereafter, on March 19, 2012, Mr. DePaula requested 12 weeks of leave under the Family and Medical Leave Act ("FMLA") to care for his mother, who had been diagnosed with dementia. ESEM granted Mr. DePaula's request, and the leave began on March 30, 2012.

ESEM and Mr. DePaula had different understandings about when Mr. DePaula's

FMLA leave would end.  Mr. DePaula believed his leave would end on June 29, 2012,[5]

but ESEM thought it would end on June 22, 2012—12 weeks from March 30, 2012.  This

discrepancy does not affect our analysis.

7. **Mr. DePaula's Termination**

In mid-May 2012, Ms. Romero "decided to eliminate" Mr. DePaula's Risk

Manager/Incident Manager/Director of Risk Management position.  *Id.* at 671.  She

interviewed candidates for "at least" the Incident Manager part of his job.  Aplt. Br. at 5.[6]

ESEM hired a new candidate by the time of its senior management meeting on June 21,

2012.  The meeting minutes announced several organizational and structural changes,

including the elimination of the Incident Manager and Risk Management positions.[7]  The

minutes also stated Ms. Jennifer Wadley "is being hired to cover Incident Management."

App. at 822.  Ms. Wadley was then 36 years old.

On June 25, 2012, Ms. Romero notified Mr. DePaula that his employment at

ESEM had been terminated.  The termination letter explained that his position had been

---

[5] Mr. DePaula emailed HR on June 21, 2012, to seek an extension.  His email stated his understanding that his FMLA leave ended on June 29, 2012, and ESEM did not correct him.

[6] Ms. Romero testified that while Mr. DePaula was out on FMLA leave, a contractor performed his "incident management" function.  *Id.* at 809.  The contractor "was doing incident management investigations" "until [ESEM] hired Ms. Wadley," *id.* at 809, "to cover Incident Management," *id.* at 822.

[7] This presentation announced that "[t]here will be no Incident Manager. . . . We will eliminate the Risk Management position which the QI Coordinator will fill." *Id.* at 820.

eliminated for budgetary reasons.[8]  The letter outlined ESEM's efforts to move Mr.

DePaula to the Director of Clinical Services and Risk Manager positions, but stated that

"ESEM can no longer afford to create positions for employees that are not needed or

critical to the delivery of services to our clients and program management."  *Id.* at 651.

The letter also referenced Mr. Johnson's dissatisfaction with Mr. DePaula's

performance:

> I must observe, however, that over the past four years of ESEM's exchanges and interactions with its licensing authority, the Department of Health, ESEM received notice that your continued management as Deputy Director, later as the Manager of Behavioral Health, was unacceptable because of program errors and lack of program oversight and compliance which occurred under your watch.

*Id.*[9]

---

[8] The termination letter stated:

> We have decided to eliminate the position of Risk Manager for Easter Seals El Mirador.  As you know, ESEM is in the process of budget cutting and cost saving in order to live within its projected revenues and cash flow.  After reviewing the organizational structure, I have determined that there is no need for a separate, stand-alone [R]isk [M]anager for the organization.

*Id.* at 651.

[9] The letter continued: "There are other, more specific, past instances of problems with your performance which I discussed with you, or Mark Johnson discussed with you.  I don't believe that it will serve any purpose to go over those instances now." *Id*. at 651.

## B. *Procedural History*

Mr. DePaula's amended complaint, the operative one here, alleged 14 claims against ESEM.[10] The district court granted summary judgment to ESEM on all 14. Mr. DePaula appeals only eight of those claims. Aplt. Br. at 23.

### 1. **Mr. DePaula's Complaint and ESEM's Motion for Summary Judgment**

Mr. DePaula's amended complaint alleged the following 14 federal and state claims—all concerning his termination:

- Count 1: Gender Discrimination under the New Mexico Human Rights Act ("NMHRA");

- Count 2: Gender Discrimination under Title VII of the Civil Rights Act of 1964;

- Count 3: Age Discrimination under the NMHRA;

- Count 4: Age Discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA");

- Count 5: Discrimination Based on Association with a Person with a Disability/Serious Medical Condition ("association discrimination") under the NMHRA;

- Count 6: Association Discrimination under the Americans with Disabilities Act of 1990 ("ADA");

- Count 7: Retaliation under the NMHRA;

- Count 8: "Wrongful/Retaliatory Discharge" under New Mexico law;

- Count 9: Breach of Covenant of Good Faith and Fair Dealing under New Mexico law;

---

[10] The amended complaint contained 13 counts. Count 13 encompassed two claims.

- Count 10: Negligent Retention and Supervision under New Mexico law;

- Count 11: Intentional Interference with Business Relations under New Mexico law;

- Count 12: "Prima Facie Tort" (as an alternative charge) under New Mexico law;

- Count 13 (two claims):
  a. Retaliation for taking leave under the Family Medical Leave Act ("FMLA") ("FMLA retaliation"); and
  b. Interference with exercise of FMLA rights ("FMLA interference").

2. **ESEM's Motion for Summary Judgment and District Court Order**

ESEM filed a motion for summary judgment on July 2, 2015. The district court granted the motion on all 14 of Mr. DePaula's claims as follows:[11]

- Counts 1 and 2—Gender Discrimination claims under the NMHRA and Title VII: Mr. DePaula failed to establish a prima facie showing that ESEM had discriminated against men because the evidence presented did not "support the suspicion that [ESEM was] that unusual employer who discrimate[d] against the majority." Op. at 5.

- Counts 3 and 4—Age Discrimination under the NMHRA and ADEA: ESEM had provided two legitimate, nondiscriminatory reasons for Mr. DePaula's termination: (1) ESEM's financial difficulties, and (2) Mr. Johnson's dissatisfaction with Mr. DePaula's performance. Mr. DePaula failed to demonstrate ESEM's proffered justifications were

---

[11] The district court applied the *McDonnell Douglas* three-part burden shifting framework—discussed further below—to Mr. DePaula's claims for gender discrimination (Counts 1 and 2), age discrimination (Counts 3 and 4), association discrimination (Counts 5 and 6), retaliation (Count 7), and FMLA retaliation (Count 13). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case for discrimination or retaliation. The burden then shifts to the employer to proffer a legitimate, nondiscriminatory reason for the adverse employment action. Finally, the burden shifts back to the employee to show the proffered reason is pretextual. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017).

pretextual.

- Counts 5 and 6—Association Discrimination under the NMHRA and ADA:  Mr. DePaula failed to establish a prima facie case because he did not show he was terminated due to his association with his mother and Mr. Quintana.  The district court noted that even assuming he could establish a prima facie case, ESEM provided legitimate reasons for Mr. DePaula's termination and Mr. DePaula failed to show those reasons were pretextual.

- Count 7—Retaliation under the NMHRA:  First, Mr. DePaula failed to establish a prima facie case of retaliation for reporting discrimination, retaliation, harassment, and a hostile work environment because there was no evidence he complained of Mr. Quintana's treatment to ESEM.  Second, he failed to establish a prima facie case of retaliation for helping Mr. Quintana because the temporal proximity between his help and his termination was insufficient to establish retaliation.  Third, Mr. DePaula's claim for retaliation for requesting and taking FMLA leave failed consistent with his FMLA retaliation claim in Count 13.  The district court's conclusions were "further supported" by ESEM's production of legitimate reasons for Mr. DePaula's termination and Mr. DePaula's failure to show those reasons were pretextual.  Op. at 21.

- Count 8—Wrongful/Retaliatory Discharge:  Because Mr. DePaula's wrongful/retaliatory discharge claim was premised on the same theory as his FMLA interference and retaliation claims in Count 13, he could seek redress for the wrong under the FMLA.[12]  He was thus precluded from raising a separate wrongful/retaliatory discharge claim for the same theory.

- Count 9—Breach of Covenant of Good Faith and Fair Dealing:  This cause of action is not available to at-will employees, like Mr. DePaula.

- Count 10—Negligent Retention and Supervision:  Mr. DePaula failed to show that ESEM's hiring or supervision of Ms. Romero created an unreasonable risk of injury to him, or other ESEM employees, or that ESEM failed to use ordinary care in hiring or supervising her.

---

[12] The district court explained that the wrongful/retaliatory discharge claim (Count 8) applied only to the type of "limited situation" where an employee has no other means of protection.  Op. at 22.

- 11 -

- Count 11—Intentional Interference with Business Relations:  Mr. DePaula failed to present evidence beyond his "suspicion" that ESEM caused other employers not to hire him, so his intentional interference with business relations claim failed as a matter of law.  Op. at 28.

- Count 12—Prima Facie Tort (as an "alternative charge"):  Mr. DePaula failed to show his prima facie tort claim was based on facts other than those used to support his other claims, so it failed as a matter of law.

- Count 13—FMLA Retaliation:  Assuming without deciding that Mr. DePaula established a prima facie case of FMLA retaliation, he failed to show ESEM's proffered justifications were pretextual.  He did not offer any evidence aside from the temporal proximity between his FMLA leave and his termination, which was insufficient, without more, to show pretext.

- Count 13—FMLA Interference:  Even though a reasonable jury could conclude Mr. DePaula was terminated while on FMLA leave, ESEM proffered two legitimate reasons for terminating Mr. DePaula, so his FMLA leave did not cause his termination.

3. **Mr. DePaula's Appeal**

Mr. DePaula timely appealed the district court's grant of summary judgment to ESEM.  He challenges the disposition of the following eight claims:

- Count 3:  Age Discrimination under the NMHRA;

- Count 4:  Age Discrimination under the ADEA;

- Count 5:  Association Discrimination under the NMHRA;

- Count 6:  Association Discrimination under the ADA;

- Count 7:  Retaliation under the NMHRA;

- Count 8:  Wrongful/Retaliatory Discharge under New Mexico law;

- Count 13 (two claims):
  a. FMLA Retaliation; and
  b. FMLA Interference.

Of these claims, Mr. DePaula's brief is inadequate as to part of Count 7 and fully inadequate as to Count 8.

Regarding Count 7, Mr. DePaula's amended complaint alleged three theories to demonstrate retaliation under the NMHRA: (1) reporting discrimination, retaliation, harassment and hostile work environment to ESEM; (2) requesting accommodation for Mr. Quintana; and (3) requesting FMLA leave. The district court granted summary judgment to ESEM on all three theories. On appeal, Mr. DePaula's brief makes one vague and confusing reference to his retaliation claim under a "Disability Association Claims" heading, stating: "The District Court erred in granting summary judgment tin [sic] ESEM's favor . . . based on an incorrect analysis and/or temporal proximity." Aplt. Br. at 18.

We decline to consider Mr. DePaula's first and second theories of Count 7 retaliation because any potential argument is inadequately briefed. *See Leathers v. Leathers*, __ F.3d __, 2017 WL 1573809, at *14 (10th Cir. May 2, 2017) (declining to consider issue when appellant "cite[d] to no legal authority, and his discussion consists largely of tangential references to other substantive areas of the case"); *Birch*, 812 F.3d at 1249 (declining to consider arguments that are "vague, confusing, conclusory, and unsupported by record evidence"). Mr. DePaula does not explain what is "incorrect" about the district court's analysis. Aplt. Br. at 18.

- 13 -

Because the district court analyzed Mr. DePaula's third NMHRA retaliation theory, which was based on his request for FMLA leave, in conjunction with its discussion of his similar federal FMLA retaliation claim (Count 13), and because Mr. DePaula has adequately briefed his federal FMLA retaliation argument on appeal, we consider his Count 7 retaliation claim as to the FMLA-request theory only. Analyzing his state and federal claims together is consistent with the New Mexico Supreme Court's consideration of "federal civil rights adjudication for guidance in interpreting the NMHRA." *Ocana v. Am. Furniture Co.*, 91 P.3d 58, 68 (N.M. 2004); *see also Garcia v. Hatch Valley Pub. Sch.*, 369 P.3d 1, 3 (N.M. Ct. App. 2015) ("When interpreting the NMHRA our Supreme Court has looked to federal decisions for guidance.").

Count 8 is inadequately briefed and not properly before us. Under the "Disability Association Claims" heading, Mr. DePaula states only: "The District Court dismissed Plaintiff's claims for wrongful/retaliatory discharge because Plaintiff also sought redress for FMLA interference and retaliation, but the District Court dismissed those FMLA claims." Aplt. Br. at 17-18. Mr. DePaula does not explain why he believes the district court erred, or why this claim is related to his "Disability Association Claims."[13] We decline to consider this argument because it is "vague, confusing, . . . and unsupported" by legal authority or record evidence. *Birch*, 812 F.3d at 1249; *Leathers*, __ F.3d __, 2017 WL 1573809, at *14.

---

[13] Mr. DePaula's amended complaint alleged only that he suffered a wrongful/retaliatory discharge for "requesting leave under FMLA and accrued leave." App. at 154.

In sum, our analysis addresses seven of Mr. DePaula's claims:

- Count 3:  Age Discrimination under the NMHRA;

- Count 4:  Age Discrimination under the ADEA;

- Count 5:  Association Discrimination under the NMHRA;

- Count 6:  Association Discrimination under the ADA;

- Count 7:  Retaliation under the NMHRA (to the extent it overlaps with the FMLA retaliation claim);

- Count 13 (two claims):
    a.  FMLA Retaliation; and
    b.  FMLA Interference.

## II.  DISCUSSION

We affirm the district court's grant of summary judgment on six of Mr. DePaula's claims because ESEM proffered legitimate, nondiscriminatory, and non-retaliatory reasons for his termination and Mr. DePaula failed to show those reasons were pretextual.  We affirm on the remaining FMLA interference claim because ESEM showed Mr. DePaula's termination was not related to the exercise of his FMLA rights.[14]

---

[14] We affirm the district court's grant of summary judgment regarding Mr. DePaula's age discrimination claims (state and federal) (Counts 3 and 4), retaliation claim (Count 7), and FMLA retaliation claim (Count 13) on the same ground as the district court:  lack of pretext.  We also affirm the summary judgment decision regarding Mr. DePaula's FMLA interference claim (Count 13) on the same ground as the district court:  failure to show his FMLA leave caused his termination.

The district court resolved Mr. DePaula's association discrimination claims (state and federal) (Counts 5 and 6) on his failure to establish a prima facie case, but also noted he failed to show pretext.  Op. at 19.  We affirm on the lack-of-pretext

- 15 -

## A. *Standard of Review*

"We review a grant of summary judgment de novo, drawing all reasonable inferences and resolving all factual disputes in favor of the non-moving party." *Birch*, 812 F.3d at 1251 (quoting *Yousuf v. Cohlmia*, 741 F.3d 31, 37 (10th Cir. 2014)). Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## B. *Burden-Shifting Claims*

The burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), applies to six of Mr. DePaula's claims:

- Count 3: Age Discrimination under the NMHRA;[15]

- Count 4: Age Discrimination under the ADEA;[16]

- Count 5: Association Discrimination under the NMHRA;[17]

---

ground.

[15] *See Cates v. Regents of N.M. Inst. of Mining & Tech.*, 954 P.2d 65, 69-70 (N.M. 1998) (applying *McDonnell Douglas* to age discrimination claim under the NMHRA).

[16] *See Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1278 (10th Cir. 2010) (applying *McDonnell Douglas* to age discrimination claim under the ADEA).

[17] ESEM and Mr. DePaula dispute whether the NMHRA forbids association discrimination. ESEM argues that the ADA expressly forbids association discrimination, 42 U.S.C. § 12112(b)(4) (forbidding discrimination "because of the known disability of an individual with whom the qualified individual is known to have a relationship or association"), and that the NMHRA prohibits discrimination only "because of . . . physical or mental handicap or serious medical condition," N.M. Stat. Ann. § 28-1-7(A) (2008). The district court denied ESEM's motion to

- Count 6: Association Discrimination under the ADA;[18]

- Count 7: Retaliation under the NMHRA (to the extent it overlaps with the FMLA retaliation claim);[19] and

- Count 13: FMLA Retaliation.[20]

The *McDonnell Douglas* framework does not apply to Mr. DePaula's remaining claim on appeal for FMLA interference (Count 13), which we will analyze separately. *See Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1227 (10th Cir. 2012) (stating "the

---

dismiss, which raised the same argument. It recognized that the New Mexico Supreme Court had not addressed this issue, but predicted the NMHRA would prohibit association discrimination to the same extent as the ADA. Because Mr. DePaula's association discrimination claim ultimately fails, we assume, without deciding, that the NMHRA would forbid association discrimination in the same way as the ADA.

We thus analyze Mr. DePaula's NMHRA association discrimination claim under the *McDonnell Douglas* framework. *See Sonntag v. Shaw*, 22 P.3d 1188, 1197 (N.M. 2001) (generally asserting that the New Mexico Supreme Court applies *McDonnell Douglas* to "determin[e] the sufficiency of a discrimination claim under the NMHRA"); *Ocana v. Am. Furniture Co.*, 91 P.3d 58, 68 (N.M. 2004) (explaining that "when considering claims under the NMHRA, [the New Mexico Supreme Court] may look at federal civil rights adjudication for guidance in interpreting the NMHRA").

[18] *See Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997). The district court here said it analyzed the association discrimination claims under a "modified version of the *McDonnell Douglas* analysis," Op. at 16 (citing *Den Hartog*, 129 F.3d at 1085). But we clarify—as we did in *Den Hartog*—that the burden-shifting scheme of *McDonnell Douglas* applies to ADA association discrimination claims. 129 F.3d at 1085.

[19] *See Juneau v. Intel Corp.*, 127 P.3d 548, 551-52 (N.M. 2005) (applying *McDonnell Douglas* to analyze claims of unlawful retaliation under the NMHRA).

[20] *See Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1229 (10th Cir. 2012) ("FMLA claims under a theory of retaliation *are* subject to the burden-shifting analysis of *McDonnell Douglas*.")

- 17 -

*McDonnell Douglas* burden shifting analysis does not apply" to FMLA interference claims).

1. **Legal Background**

   a. *General Legal Background*

   A plaintiff can show intentional discrimination either by direct evidence of discrimination or by indirect evidence. *Tabor v. Hilti*, *Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). Proof of discrimination by indirect evidence follows the three-part burden-shifting framework articulated in *McDonnell Douglas*. *Id.*

   i. *McDonnell Douglas* framework

   Under the three-part *McDonnell Douglas* framework, the burden of production shifts from the plaintiff to the defendant and back to the plaintiff. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). But the plaintiff bears the ultimate burden of persuasion to show discrimination. *Burdine*, 450 U.S. at 256; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

   First, the plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. *See Burdine*, 450 U.S. at 252-53; *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 539-40 (10th Cir. 2014). Generally, a plaintiff may establish a prima facie case of wrongful termination by showing that: "(1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge." *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999). Although the "articulation of the plaintiff's prima facie test might vary somewhat depending on the context of the claim," "[t]he critical

prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (quotations omitted). If the plaintiff establishes a prima facie case, a rebuttable presumption arises that the defendant unlawfully discriminated against the plaintiff. *See St. Mary's Honor Ctr.*, 509 U.S. at 506-07.

Second, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff. *See McDonnell Douglas*, 411 U.S. at 802. The defendant's burden is "exceedingly light," *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 899-900 (10th Cir. 2017), as its stated reasons need only be legitimate and non-discriminatory "on their face," *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011). The defendant must provide "admissible evidence" of a "legally sufficient" explanation for the employment action that raises a genuine issue of material fact "as to whether [the defendant] discriminated against the plaintiff." *Burdine*, 450 U.S. at 254-55; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citing *Burdine*). But the defendant's "burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves*, 530 U.S. at 142 (quotations omitted).

Third, "the burden shifts back to the plaintiff to demonstrate that the employer's justification is pretextual"—not the true reason for the employment decision—by a preponderance of the evidence. *Smothers*, 740 F.3d at 540; *Williams*, 849 F.3d at 900.

ii. Pretext

Because much of our analysis concerns the pretext element of *McDonnell Douglas*, we provide additional legal background.

To survive a motion for summary judgment at the pretext step, the plaintiff must present evidence to establish there is a genuine issue of material fact as to whether the defendant's articulated reason for the adverse employment action was pretextual. *Tabor*, 703 F.3d at 1218; *Kendrick*, 220 F.3d at 1225.

A plaintiff may show pretext by demonstrating the "proffered reason is factually false," or that "discrimination was a primary factor in the employer's decision." *Tabor*, 703 F.3d at 1218; *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1194 (10th Cir. 2016). This is often accomplished "by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Tabor*, 703 F.3d at 1216 (alterations and quotations omitted). A plaintiff may also show pretext by demonstrating "the defendant acted contrary to a written company policy," an unwritten company policy, or a company practice "when making the adverse employment decision affecting the plaintiff." *Kendrick*, 220 F.3d at 1230.

Although we may consider all of the foregoing matters, "[w]e may not second guess the business judgment of the employer." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (quotations omitted). Evidence that the employer "should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is

unworthy of credibility."  *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169-70 (10th Cir. 2007).  "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*," and "do not look to the plaintiff's subjective evaluation of the situation."  *C.R. England*, 644 F.3d at 1044 (citations and quotations omitted).  Instead of asking whether the employer's reasons "were wise, fair or correct," the relevant inquiry is whether the employer "honestly believed those reasons and acted in good faith upon those beliefs."  *Swackhammer*, 493 F.3d at 1170 (quotations omitted).

2.  **Analysis**

We assume without deciding that Mr. DePaula established a prima facie showing for his six claims (Counts 3-7, 13) alleging age discrimination (state and federal), association discrimination (state and federal), retaliation (state), and FMLA retaliation (federal).  The following analysis concludes that Mr. DePaula has failed to establish a genuine issue of material fact that ESEM's two proffered reasons for Mr. DePaula's termination were pretextual.  We thus affirm the grant of summary judgment for ESEM on each of Mr. DePaula's burden-shifting claims.

a.  *ESEM's legitimate, nondiscriminatory reasons for termination*

ESEM had two legitimate, nondiscriminatory reasons for terminating Mr. DePaula's employment:  (1) ESEM's financial difficulty and restructuring and (2) Mr. DePaula's inadequate performance.

### i. ESEM's financial state

ESEM has successfully articulated that its financial hardship was a "legitimate, nondiscriminatory reason" for its decision to terminate Mr. DePaula. *Kendrick*, 220 F.3d at 1226. The financial hardship rationale was based on the termination letter, Ms. Romero's deposition and affidavit, the chief financial officer's affidavit, minutes from senior management meetings, and Mr. DePaula's deposition.

Mr. DePaula's termination letter relied primarily on ESEM's "cost saving" measures to combat its financial hardship. App. at 651. The first paragraph of the letter explained that ESEM had decided to eliminate his position because "ESEM is in the process of budget cutting and cost saving in order to live within its projected revenues and cash flow," and thus, there was no need for a separate Risk Manager position. *Id.* ESEM could "no longer afford" to create or maintain positions that were "not needed or critical to the delivery of services to our clients and program management." *Id.*

Ms. Romero attested in her affidavit and testified at her deposition that Mr. DePaula was terminated due to ESEM's financial difficulties. She said:

- "In mid-May 2012, I determined that [ESEM] could no longer afford to have a full time [R]isk [M]anager at an $80,000 salary and decided to eliminate John DePaula's position." *See id.* at 671.

- "The finances were really worse than we thought. We weren't able to maintain a lot of the positions that we were–that we were looking at. And [Mr. DePaula's] was one position we were going to have to eliminate. It was an administrative position and a high-paying position." *Id.* at 625.

- "We eliminated his position because we could not afford it." *Id.* at 626.

Ms. Romero also described in her affidavit and at her deposition the organizational changes at ESEM that occurred in response to the financial problems. At her deposition, she stated: "At that time we were consolidating a lot of the positions and a lot of the duties. So many of us at the agency held two or three [jobs]." *Id.* at 622. In her affidavit, she attested that she eliminated at least 12 positions during 2012 (though most "did not involve terminations, but involved closing vacant positions and not refilling them following resignation or retirement"). *Id.* at 671-72. She also "set in motion job eliminations and terminations in 2013 to continue on program cost containment to bring [ESEM's] budget into balance." *Id.* at 672.

ESEM submitted Chief Financial Officer Mike Easley's affidavit, which addressed the nonprofit's financial difficulties:

- Upon Mr. Easley's arrival at ESEM in September 2011, "[i]t became apparent to me . . . that there was an every-increasing [sic] cash flow issues [sic] for ESEM" and that ESEM was "having trouble paying its regularly occurring bills." *Id.* at 676.

- "By December 31, 2011 . . . they had incurred $1 million dollars in net loss." *Id.* at 677.

- "The effort to implement cost containment measures started in January 2012." *Id.* Nonetheless, "[f]or the remainder of my employment at ESEM, which concluded in October[] 2013, ESEM continued to experience severe cash shortfalls." *Id.*

The minutes from the January 2012 senior management meeting show that ESEM was "dealing with checks not being paid and reimbursements behind schedule, which have caused problems with cash flow." *Id.* at 817. They further explain that FOKT's contribution would help with cash flow until the other checks came in. The April 2012

senior management meeting minutes reflect Mr. Johnson's statement that although ESEM was "breaking even" and doing better than other providers experiencing a two-million-dollar loss, the next year would need to be a "rebase year" and would require creative spending to get rates up. *Id.* at 818.

Mr. DePaula's own testimony regarding the months preceding his termination showed that ESEM's financial difficulties were genuine. He explained ESEM "was having major cash flow issues. The staff who were calling me would tell me that utilities were turned off, and there were all kinds of issues because of cash flow problems." *Id.* at 648.

Based on the foregoing, we agree with the district court that ESEM's financial circumstances provided a legitimate, nondiscriminatory reason for Mr. DePaula's termination. *See Jones v. Unisys Corp.*, 54 F.3d 624, 631-32 (10th Cir. 1995) (stating that financial hardship resulting in workforce reduction as part of cost-cutting measures constituted a legitimate, nondiscriminatory reason for plaintiff's termination). As previously noted, Mr. DePaula's termination letter cited this reason for why he was being fired.

ii.  Mr. DePaula's performance

Mr. DePaula's performance issues provided an additional legitimate and nondiscriminatory reason for ESEM's decision to terminate Mr. DePaula's employment.

Although Mr. DePaula's termination letter focused on ESEM's financial hardship, it also "observe[d]"—and spent almost equal space—on Mr. DePaula's performance issues. App. at 651. It explained that "over the past four years of ESEM's exchanges . . .

- 24 -

with its licensing authority, the Department of Health, ESEM received notice that [Mr. DePaula's] continued management . . . was unacceptable because of program errors and lack of program oversight and compliance which occurred under [his] watch." *Id.* It also mentioned the "other, more specific, past instances of [performance] problems" Ms. Romero or Mr. Johnson had previously discussed with Mr. DePaula, but noted that there was no reason to go over those instances in the letter. *Id.*

Mr. Johnson's memoranda repeatedly criticized Mr. DePaula's performance,[21] showed their working relationship was deteriorating,[22] and reflected that Mr. DePaula did not implement his suggested changes.[23]

These performance issues negatively affected ESEM. Mr. Johnson stated in his affidavit that "[i]n 2009 to 2011, through the negligence of John DePaula in performing his management duties at Easter Seals, ESEM came close to losing its licenses for the houses it operated," and that "[e]ach license represents almost $1 Million Dollars of revenue stream to [ESEM]." *Id.* at 678-79. Mr. Johnson further stated that Mr. DePaula was "personally responsible to maintain full occupancy of the houses," and his failure to do so "jeopardiz[ed] stable finances for [ESEM]." *Id.* at 679-80.

---

[21] *See, e.g.*, App. at 604 ("I am not willing to continue to work whereby I have to continually intervene to solve day to day programmatic operational issues."); *id.* at 609 ("I cannot continue to have resolutions to issues be delayed, as it seems to have been becoming a pattern with your approach to problem solving.").

[22] *See, e.g.*, *id.* at 608 ("We need to have a positive trustful relationship which I believe has been challenged as a result of your perceptions about what has occurred.").

[23] *See, e.g.*, *id.* at 604 ("I must insist that any future dismissal of a directive from me will not be tolerated.").

Mr. DePaula admitted that his lack of oversight caused ESEM to be fined $8,000, which was ultimately deducted from his salary. He explained that after the state said it had not received a particular report, he discovered he had not sent it. He "accept[s] responsibility for not sending that report." *Id.* at 645; *see also id.* at 757 (stating in his affidavit that he "certainly took ultimate responsibility for the late filing").

The problems with Mr. DePaula's performance provided a legitimate, nondiscriminatory reason for Mr. DePaula's termination. *See Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984) (stating that "insubordination could serve as a legitimate non-discriminatory reason for discharge"); *see also Brown*, 700 F.3d at 1227-28 (finding employer's identification of detailed, specific performance issues and evidence of continued problems to be legitimate reason for termination within FMLA interference context). Although she did not rely exclusively on this reason, Ms. Romero included Mr. DePaula's performance issues in the termination letter.

b. *Mr. DePaula's failure to demonstrate pretext*

Mr. DePaula failed to establish a genuine issue of material fact as to whether ESEM's proffered reasons for his termination were pretextual. His arguments either lack record support or do not render ESEM's proffered reasons to be so weak, implausible, inconsistent, incoherent, or contradictory that a reasonable factfinder could find them "unworthy of credence." *Tabor*, 703 F.3d at 1218. We reject each of his pretext arguments.

i.    Mr. DePaula's arguments regarding ESEM's financial state

Mr. DePaula makes several factual arguments challenging ESEM's financial justification for his termination.  None render ESEM's asserted financial state to be implausible or unworthy of belief.  *Tabor*, 703 F.3d at 1218.

First, Mr. DePaula argues FOKT's January 2012 contribution of $150,000 to ESEM alleviated its financial straits and cash flow problem.  But Mr. Johnson's deposition testimony explained that FOKT's assets do not belong to ESEM, FOKT is not obligated to fund ESEM, FOKT has contributed to ESEM only once since 2009, and FOKT does not contribute to ESEM salaries or bonuses.  Mr. DePaula has not challenged these points and therefore has failed to show ESEM's inability to afford his position is a disputed fact.  FOKT's contribution allowed ESEM to "break even" by April 2012.  The contribution stemmed from ESEM's "dealing with checks not being paid and reimbursements behind schedule, which have caused problems with cash flow."  App. at 817.  It follows that, without FOKT's contribution, ESEM would likely have incurred a $150,000 deficit.[24]

_____

[24] Mr. DePaula similarly argues Mr. Johnson's statement that ESEM was "breaking even" financially in April 2012 and that ESEM's next year was a "rebase year" demonstrates pretext.  Aplt. Br. at 40.  But this statement supports—rather than detracts from—ESEM's financial hardship.  ESEM explained it was able to break even only because of FOKT's one-time contribution.  The January 2012 meeting minutes show that ESEM was having cash flow issues because it was waiting on reimbursement checks.  The April 2012 meeting minutes, which followed the FOKT contribution, report that having a "rebase year" meant ESEM must "find a way to spend creatively, to get rates up, perhaps by spending in the latter part of the fiscal year."  App. at 818.  This hardly demonstrates fiscal security.

Second, Mr. DePaula's assertion that ESEM frequently experienced cash flow problems over the years does not render implausible that it was having similar problems in 2012 before Mr. DePaula's termination. Mr. DePaula's own testimony acknowledges ESEM's cash flow problems at that time.

Third, he points out that ESEM moved into a six-million-dollar facility in December 2011, that ESEM hired Ms. Romero in January 2012 at a salary of $125,000, and that Mr. Johnson's salary was over $150,000. Regarding the facility, Mr. DePaula explained that FOKT "own[ed] the [administration building] and ESEM apparently makes lease payments (approximately $25,000 per month for the administration building) to FOKT." *Id.* at 315. The new facility is thus not an ESEM asset. Mr. DePaula also fails to explain why Ms. Romero's and Mr. Johnson's salaries render ESEM's financial state unworthy of credence, particularly because—as Mr. DePaula acknowledged at his deposition—when Ms. Romero was hired as COO, her responsibility was to "accomplish cost containment." *Id.* at 635.

Fourth, Mr. DePaula argues that the sequence of events before his termination casts doubt on ESEM's financial justification. He notes Ms. Romero eliminated his position only two months after moving him into it and decided to do so while he was on FMLA leave. But this timeline is consistent with ESEM's financial difficulties and its willingness to accommodate and reassign Mr. DePaula until it could no longer afford to do so. In a March 2012 email to HR titled "Position Changes," Ms. Romero said ESEM was making eight personnel changes, including moving Mr. DePaula to Risk Manager/Incident Manager. *Id.* at 791. Ms. Romero then explained that in mid-May

- 28 -

2012, she "determined that ESEM could no longer afford to have a full time [R]isk [M]anager at an $80,000 salary." *Id.* at 671. She also made several organizational changes "to meet the agency needs" around this time. *Id.* at 791. She attested in her affidavit that she eliminated twelve positions (both by eliminating positions and not filling resignations) during 2012 and continued making structural changes into 2013—after Mr. DePaula's termination—to implement cost containment.

In sum, Mr. DePaula has failed to show a genuine issue of material fact that ESEM's financial rationale for the elimination of his position was a pretext for his termination.

### ii.   Mr. DePaula's arguments regarding performance

Mr. DePaula's failure to demonstrate a factual dispute as to whether ESEM's financial justification was pretextual would be sufficient to uphold summary judgment for ESEM. But he similarly has failed to raise doubt about ESEM's dissatisfaction with his performance.

First, Mr. DePaula points to Ms. Romero's testimony that she "didn't have any performance issues with Mr. DePaula" and that "[ESEM was] in a financial crisis and we had to eliminate his position. That was my recommendation." *Id.* at 810-11. But Ms. Romero testified that she did not "conduct or perform any kind of performance evaluation on Mr. DePaula." *Id.* at 811. Mr. DePaula also overlooks his termination letter. It begins by stating that ESEM decided to eliminate the position of Risk Manager because it was in the process of budget cutting and cost saving. It next identified Mr. DePaula's performance as a second, alternate basis for his termination. Although Ms.

- 29 -

Romero might not have had issues with Mr. DePaula's performance, Mr. Johnson, ESEM's CEO and long-time supervisor of Mr. DePaula, plainly did.

Second, Mr. DePaula argues Mr. Johnson's memoranda were sent three years before his termination and were thus too attenuated to matter. But those memoranda expressed concerns consistent with more recent performance shortcomings. For example, the memoranda stated that Mr. DePaula must improve his oversight and management abilities and that he may not dismiss directives from management any longer. *See, e.g.*, *id.* at 604. These same concerns applied to his 2011 penalty for failure to timely submit ESEM's report.

Third, Mr. DePaula contests the significance of the CMP—the penalty imposed on ESEM because Mr. DePaula failed to file a report—as a reflection of his performance, citing a hearsay statement from the deposition of a DOH employee, Amber Espinoza-Trujillo, that ESEM viewed CMPs as the "cost of doing business." Aplt. Br. at 37. But Ms. Espinoza-Trujillo also testified that she did not remember from whom she heard that statement and expressed disbelief and shock that anyone at ESEM would say that. App. at 829. Mr. DePaula therefore attempts to rely on a suspect hearsay statement, which cannot be used to contest a motion for summary judgment. *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995) ("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment.").

Fourth, Mr. DePaula points to his salary increases. But when considered in context, they are not inconsistent with his poor performance. Mr. DePaula does not contest that his 2009 and 2010 salary increases were for accrued leave and for an overdue

- 30 -

salary increase afforded to upper level management. They cast no light on his performance. Mr. Johnson also attested that he "approved a 10% retroactive pay increase for all of the Senior Team managers because they had not received a pay increase for several years. . . . Even though I was dissatisfied with Mr. DePaula's performance, I did not withhold from him the same raise I gave to all of the Senior Team managers." App. at 679.

Mr. DePaula has failed to create a genuine issue of material fact that ESEM's reliance on Mr. DePaula's poor performance to terminate him was pretextual.

### iii. Mr. DePaula's arguments regarding FMLA retaliation

Mr. DePaula raises additional arguments on appeal regarding pretext that are specific to his FMLA retaliation claim. All of them fail.

Mr. DePaula first argues the district court failed to recognize that the temporal proximity between his taking FMLA leave and his termination supports an inference of pretext. "Although we may consider evidence of temporal proximity—typically used to establish a prima facie case—in analyzing pretext, temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext." *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007) (citations omitted); *Metzler*, 464 F.3d at 1172 ("[T]his court has refused to allow even very close temporal proximity to operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext." (quotations and alterations omitted)). Thus, "temporal proximity can support a finding of pretext only in combination with other evidence of pretext." *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1293 (10th Cir. 2013); *Metzler*, 464 F.3d at 1172 ("To raise

- 31 -

a fact issue of pretext, [the plaintiff] must . . . present evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive."). Because Mr. DePaula's other pretext arguments fail, "close temporal proximity alone is of no moment in this case." *Lobato*, 733 F.3d at 1293.

Mr. DePaula appears to have forfeited his other pretext arguments regarding his FMLA retaliation claim. In his response to ESEM's motion for summary judgment, he raised three of them in the context of discussing his FMLA interference claim. He now contends, without arguing for plain-error review, that they support a finding of pretext regarding his FMLA retaliation claim. *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993) (refusing to allow a party to "lose in the district court on one theory of the case, and then prevail on appeal on a different theory"); *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130-31 (10th Cir. 2011) (failing to argue plain error on appeal "marks the end of the road" for reversal on an argument not first presented to the district court). Even if Mr. DePaula's summary judgement opposition could be read as having made these arguments as to both his FMLA interference *and* retaliation claims, they nonetheless fail on appeal.

First, Mr. DePaula argues ESEM failed to follow its own FMLA policy, giving rise to an inference of pretext.[25] ESEM's policy required reinstatement of employees on

---

[25] "[A]n employee's mere allegation that his employer deviated from company policy is insufficient to prove pretext; rather, the employee must present evidence that the employer believed that a relevant company policy existed, and chose to deviate from the policy in spite of that belief." *Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897, 910 (10th Cir. 2011) (unpublished) (cited for persuasive value under 10th Cir. R. 32.1(A)); *see also Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007)

FMLA leave.[26]  But it also provided that "ESEM may choose to exempt certain highly compensated employees from this requirement and not return them to the same or similar position."  App. at 793.  Mr. DePaula expressly recognizes this provision, Aplt. Br. at 48, but has failed to show he is not exempt from the policy or otherwise demonstrate how this argument raises an issue of pretext.[27]

Second, Mr. DePaula argues ESEM failed to follow 29 C.F.R. § 825.219, giving rise to an inference of pretext.  Section 825.219 requires an employer to give written notice to a "key employee" if it believes the employee will not be reinstated from FMLA leave.[28]  But, again, Mr. DePaula has failed to show he is a "key employee" for purposes of § 825.219, or otherwise demonstrate how this argument creates an issue of pretext.

Third, Mr. DePaula appears to argue that ESEM's practice in litigation of withholding from discovery its internal spreadsheet documenting its employees' FMLA

_____

("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that . . . the substantive reasons given by the employer for its employment decision were pretextual." (quotations omitted)).  Here, Ms. Romero testified at her deposition that because ESEM "totally eliminated Mr. DePaula's position," she "didn't feel that [she] had to offer him another position" under the FMLA policy, and that she "didn't have a position at that [time] to offer him."  App. at 815.

[26] ESEM's FMLA policy required that an employee who took FMLA leave must "be able to return to the same job classification or a job with equivalent pay, benefits, and other employment terms."  Id. at 793.

[27] The record shows that other ESEM employees received salary adjustments in 2012 to "$20.00 per hour," "$32,000," and "$38,000 per year."  Id. at 791.  Mr. DePaula had been at ESEM for 22 years and made $88,275 per year.  Id. at 763.

[28] "A key employee is a salaried FMLA-eligible employee who is among the highest paid 10 percent of all the employees employed by the employer within 75 miles of the employee's worksite."  29 C.F.R. § 825.217.

- 33 -

leave creates an inference of pretext. Mr. DePaula alleges the spreadsheet was not produced in two other cases involving ESEM employees. He fails to show why this creates an inference of pretext in his case. Indeed, ESEM produced the spreadsheet to Mr. DePaula in this case. *See* App. at 722.

In addition to Mr. DePaula's failure to show how any of these arguments create an issue of pretext, the arguments also do not overcome or cast doubt on ESEM's financial hardship or Mr. DePaula's performance reasons for his termination.[29]

\* \* \* \*

Assuming without deciding Mr. DePaula established a prima facie case for his six burden-shifting claims (Counts 3-7, 13), ESEM has proffered two legitimate and nondiscriminatory justifications for terminating Mr. DePaula: (1) ESEM's financial hardship; and (2) Mr. DePaula's performance issues. Mr. DePaula has failed to show that there was a genuine dispute of material fact as to whether either of these reasons was pretextual or "unworthy of belief." *Brown*, 700 F.3d at 1229; *Tabor*, 703 F.3d at 1218.

C. **FMLA Interference (Count 13)**

As explained above, the *McDonnell Douglas* burden-shifting framework does not apply to Mr. DePaula's claim for FMLA interference. *See Brown*, 700 F.3d at

---

[29] Mr. DePaula also attempts to raise two other pretext arguments on appeal: (1) his coworkers' statements show that Ms. Romero said she was going to terminate him while he was on FMLA leave; and (2) ESEM had demonstrated a "pattern" of retaliation against other employees. Mr. DePaula has forfeited these arguments because they were not adequately presented to the district court. App. at 741. He does not argue plain error on appeal, so we decline to address these arguments. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130-31 (10th Cir. 2011).

1227. Applying the applicable law, we affirm the district court's grant of summary judgment.

1. **Legal Background**

To establish an FMLA interference claim, "an employee must show that (1) he was entitled to FMLA leave, (2) an adverse action by his employer interfered with his right to take FMLA leave, and (3) this adverse action was related to the exercise or attempted exercise of the employee's FMLA rights." *Id.* at 1226. "A deprivation of these rights is a violation regardless of the employer's intent, and the *McDonnell Douglas* burden shifting analysis does not apply." *Id.* at 1226-27.

We assume Mr. DePaula could establish the first two elements and focus on the third. Under that element, an "employee may be dismissed, preventing her from exercising her statutory right to FMLA leave[,] . . . if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1006 (10th Cir. 2011) (alterations and quotations omitted). An "employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request." *Id.* (quotations omitted) (citing *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998)).[30]

---

[30] Our cases have said that the employee-plaintiff must show all three elements. *See, e.g.*, *Dalpiaz v. Carbon Cty., Utah*, 760 F.3d 1126, 1132 (10th Cir. 2014); *Brown*, 700 F.3d at 1226; *Twigg*, 659 F.3d at 1006; *Campbell*, 478 F.3d at 1287; *Metzler*, 464 F.3d at 1180. But we also have said that when "the employee can demonstrate that the first two elements of interference are satisfied, the employer then bears the burden of demonstrating that the adverse decision was not related to

Because "intent is not necessary for FMLA interference claims and [] there is no burden-shifting *McDonnell Douglas* analysis," summary judgment for the employer is warranted when there is no genuine dispute as to any material fact regarding alternative reasons for termination; "no pretext analysis is necessary." *Brown*, 700 F.3d at 1227-28.

2. **Analysis**

The district court correctly granted summary judgment to ESEM on this claim. Assuming Mr. DePaula could satisfy the first two elements of his FMLA interference claim, ESEM has demonstrated that he would have been terminated regardless of his request for, or taking of, FMLA leave, and Mr. DePaula has not proved otherwise. As outlined above, ESEM provided evidence of two alternative reasons for Mr. DePaula's termination: (1) ESEM's financial hardship and (2) Mr. DePaula's performance issues. Even if he was fired during his FMLA leave, ESEM has demonstrated that Mr. DePaula would have been fired irrespective of taking that leave. Accordingly, ESEM's termination decision was not "related to" the exercise of Mr. DePaula's FMLA rights. *Twigg*, 659 F.3d at 1006.

---

the exercise or attempted exercise of the employee's FMLA rights." *Dalpiaz*, 760 F.3d at 1132 (alterations and quotations omitted). Other cases have described the employer's ability to show the "employee would have been terminated anyway, i.e. regardless of the request for FMLA leave," to be a "defen[se]" or "affirmative defense" raised by the employer against the entire FMLA interference claim. *Brown*, 700 F.3d at 1227; *see also Metzler*, 464 F.3d at 1180 ("The burden to demonstrate that an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave is on the defendant-employer." (quotations omitted)). Regardless of whether the plaintiff or defendant bears the burden on this element, the record in this case supports summary judgment for ESEM on the FMLA interference claim.

## III. **CONCLUSION**

We affirm the grant of summary judgment in favor of ESEM.