**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 25, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

_____

CHARLES PAYAN,

    Plaintiff - Appellant,

v.

UNITED PARCEL SERVICE; LISA
CERQUEIRA; CAROLEE STREEPER,

    Defendants - Appellees.

No. 19-4017
(D.C. No. 2:15-CV-00905-RJS)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **MATHESON**, and **McHUGH**, Circuit Judges.
_____

In 2014, Charles Payan sued his employer, United Parcel Service ("UPS"), for racial discrimination. While the lawsuit was pending, UPS began investigating Mr. Payan for suspected timecard violations. The investigation revealed that he had instructed his subordinates to alter their timecards. UPS disciplined Mr. Payan for violating the company's integrity policy and stripped him of his yearly raise and annual stock distribution.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

1

Mr. Payan then filed a second lawsuit under 42 U.S.C. § 1981, alleging that UPS had investigated and disciplined him in retaliation for his earlier lawsuit. The district court granted summary judgment for UPS. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. **BACKGROUND**

Before describing the factual and procedural background of this case, we provide a brief overview of 42 U.S.C. § 1981 retaliation claims. We then discuss the events leading to this appeal.

### A. *Title 42 U.S.C. § 1981 Retaliation Claims*

Title 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The Supreme Court has interpreted this statute to "prohibit[] not only racial discrimination but also retaliation against those who oppose it." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 355 (2013) (citing *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445 (2008)).

"[A] plaintiff bringing a retaliation claim must establish that retaliation played a part in the employment decision . . . ." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (quotations omitted). The plaintiff "may choose to satisfy this burden in two ways." *Id.* (quotations omitted). First, a plaintiff may take the "direct/'mixed motives' approach" by "directly show[ing] that retaliatory animus played

2

a motivating part in the employment decision." *Id.* (quotations omitted).[1]  Second, the

plaintiff "may instead rely on the three-part framework established in *McDonnell*

*Douglas Corp. v. Green* to prove retaliation indirectly." *Id.* (citation omitted); *see EEOC*

*v. C.R. England, Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011) ("If a plaintiff offers no

direct evidence of discrimination, which is often the case, the court applies the burden-

shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*

. . . ." (citation omitted)).

Under the three-part *McDonnell Douglas* burden-shifting framework, the plaintiff

must first make out a prima facie case of retaliation by demonstrating "(1) that [s]he

engaged in protected opposition to discrimination, (2) that a reasonable employee would

have found the challenged action materially adverse, and (3) that a causal connection

existed between the protected activity and the materially adverse action." *Twigg*, 659

F.3d at 998 (quoting *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008)).

The burden then shifts to the employer to articulate a "legitimate, nonretaliatory reason

---

[1] "In order to be direct, evidence must prove the existence of a fact in issue without inference or presumption." *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1188 n.6 (10th Cir. 2007) (quotations omitted).  Such evidence could include an employer's facially discriminatory policy, *see, e.g.*, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985), or "oral or written statements on the part of a defendant showing a discriminatory motivation," *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000).

for its decision." *Id.* If the employer provides this explanation, the burden shifts back to the plaintiff to "show that the employer's reason is merely a pretext for retaliation." *Id.*[2]

"So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered non-discriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial." *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995). If the plaintiff cannot satisfy the pretext step of this burden-shifting framework, the employer is entitled to summary judgment "even though [the] plaintiff has established a prima facie case" of retaliation. *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1397 (10th Cir. 1997); *see also Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1260 (10th Cir. 2001); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (affirming grant of summary judgment for employer where plaintiff established prima facie case of discrimination but could not establish pretext).

## B. *Factual Background*

### 1. *Payan I*

Mr. Payan is a Hispanic man who has worked for UPS since 1991. In 2009, Charles Martinez became Mr. Payan's supervisor. Shortly after, Mr. Martinez conducted

---

[2] The same burden-shifting framework applies to Title VII retaliation claims. *See Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017) ("When courts consider § 1981 retaliation claims, 'the principles set forth in Title VII retaliation cases apply with equal force . . . .'" (quoting *Twigg*, 659 F.3d at 998)).

Mr. Payan's semiannual quality performance review and rated him as "development needed." App. at 209.

Mr. Payan felt Mr. Martinez was discriminating against him because of his race. He complained to Human Resources ("HR") and eventually filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). In 2014, the EEOC issued a Right to Sue Notice. Mr. Payan then sued UPS and Mr. Martinez for racial discrimination, retaliation, breach of contract, breach of the duty of good faith and fair dealing, and violation of public policy ("*Payan I*").

UPS and Mr. Martinez moved for summary judgment. The district court granted the motion and dismissed Mr. Payan's claims. *See id.* at 158-79. Mr. Payan appealed, and we affirmed. *Payan v. United Parcel Serv.*, 905 F.3d 1162 (10th Cir. 2018).

### 2. *Payan II*

#### a. *UPS timekeeping systems and policies*

UPS employees are responsible for logging their start, finish, and lunch break times. UPS uses two systems to track employee hours: a Global Timecard System ("GTS") for delivery drivers and loaders, and a Personal Timecard Recording System ("PTRS") for hourly office workers. Once employees enter their hours into GTS and PTRS, supervisors verify the entries.

UPS employees are not supposed to work more than eight hours each day unless they receive specific approval to do so. In addition, Department of Transportation regulations require UPS drivers to take a 30-minute lunch break each day. *See* 49 C.F.R.

5

§ 395.3. In his deposition, Mr. Payan confirmed that "making sure . . . drivers were staying in compliance with the DOT rules [was] something that would have been under [his] discretion and authority." App. at 819. He also stated that failing to adhere to DOT regulations could lead to "issues" and "exposure with unions and labor organizations." *Id.* at 821.

### b. *GTS timecard investigation*

#### i. Mr. Payan's new role and GTS timecard issues

While *Payan I* was pending, Mr. Payan became a Business Manager in UPS's Wasatch Center. His responsibilities included ensuring drivers satisfied UPS's time, safety, and production requirements. He also oversaw several UPS supervisors.

In late April 2015, UPS supervisor Jake Scott approached Division Manager Joseph Braham to discuss a problem with driver timecards. Mr. Scott informed Mr. Braham that a UPS driver, Shane Henschen, had complained that his timecards were being altered to reflect lunch breaks he had not taken. Mr. Scott admitted he had modified Mr. Henschen's timecards but claimed Mr. Payan instructed him to do so.

Soon after, Mr. Payan approached Mr. Braham to discuss the timecard issues.[3] Mr. Payan testified that he "told [Mr. Braham] exactly what the problem was" and that

---

[3] The parties offer different explanations of how Mr. Scott and Mr. Payan learned about the timecard issues. According to UPS, Mr. Henschen first approached Mr. Scott, who then relayed the information to Mr. Payan. *See* Aplee. Br. at 4-5. According to Mr. Payan, Mr. Henschen approached him directly to express concern that Mr. Scott might be altering his timecards. *See* App. at 807. Mr. Payan testified that he immediately confronted Mr. Scott about the allegations, and that Mr. Scott admitted that he had been changing timecards without permission. *Id.* Mr. Payan also claimed that he "asked [Mr.

6

"[Mr. Scott] [was] changing time cards." *Id.* at 813. Mr. Payan also informed Mr. Braham that he "had the payroll adjustments ready to go and [was] more than happy to do them." *Id.*[4]

### ii. Mr. Braham's GTS investigation

After speaking with Mr. Payan and Mr. Scott, Mr. Braham began an investigation. He reported the timecard problem to UPS's operations and labor managers and asked Mr. Scott to collect documentation of the altered timecards. He also began taking statements from employees.

Mr. Scott provided a written statement. In it, he claimed that in February 2015, "[Mr. Payan] instructed [him] to adjust the timecards to reflect a 30 minute lunch, and to do this for every driver that didn't take a full lunch daily from that point forward." *Id.* at 376. Mr. Scott also claimed that drivers had complained about their altered timecards, he had reported the complaints to Mr. Payan, and Mr. Payan had responded, "[I]t will be fine, don't worry about it." *Id.* at 377. Mr. Scott explained that after he reported the timecard problem to Mr. Braham, Mr. Payan instructed the supervisors to tell Mr.

---

Scott] to get all the facts together" and to determine which drivers were affected, how much time had been changed, and how much money UPS owed. *Id.*

[4] UPS claims that Mr. Payan did not present "information about having . . . pay adjustments . . . ready," App. at 610, but simply asked Mr. Braham, "[W]hat do you want me to do with these timecards[?]," *id.* at 611. Because Mr. Payan is the nonmoving party, we construe this disputed fact in his favor. *See Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 882 (10th Cir. 2018).

Braham, "[T]here was a miscommunication between myself and the onroad team about the procedure to adjust the lunches. And . . . there was a miscommunication between the onroad supervisor and [Mr. Payan] to get drivers['] signatures." *Id.* at 378. Mr. Scott also claimed that Mr. Payan told him, "Stick to [the] story and we will all be fine." *Id.*

Brad Williams, another UPS supervisor, also provided a written statement. According to Mr. Williams, Mr. Payan instructed supervisors to look at a "daily report . . . that would show . . . which drivers had not taken a lunch on the day prior" and to "add a lunch to their time-card in GTS." *Id.* at 380. Mr. Williams also stated that Mr. Payan "ask[ed] about drivers['] lunches everyday [sic], always emphasizing that they were to be put in GTS ASAP." *Id.* "[I]f [Mr. Scott] or I hadn't corrected lunches," Mr. Williams described, "[Mr. Payan] would always tell us to be sure to get them in the system." *Id.* at 381. At the end of his statement, Mr. Williams handwrote, "It is my understanding and belief that any and all driver timecard edits done in [the] Wasatch Center during the period of Feb[ruary]-April 2015 were done under the direct instruction of Wasatch Center Manager, Chuck Payan." *Id.*

Supervisor Kendall Payne's written statement recounted that during the supervisors' morning meeting, "[Mr. Payan asked] about timecard corrections and how much we had gotten back." *Id.* at 382. Mr. Payne stated he was later instructed "to question the drivers who did not record taking lunch and to make a notation as to whether they did or not. . . . The notes and paperwork were then to be put in a file in the

8

sup[ervisors'] office as [a] record of any corrections that needed to be done or that occurred."[5]  *Id.*

Supervisor Bryan Wilkinson's written statement explained that in March 2015, Mr. Payan "briefly mentioned, in our morning meeting, that [Mr. Scott] was going to make changes to timecards to make sure drivers were coding out their full lunch."  *Id.* at 384.  When Mr. Wilkinson "objected," Mr. Payan responded "that every driver needed to take a full 30 minute lunch and if they didn't, [Mr. Scott] was going to correct them."  *Id.* Mr. Wilkinson stated that when he learned about Mr. Henschen's timecard concerns, he approached Mr. Scott, who "affirmed" that he altered Mr. Henschen's timecard and admitted to changing "lots" of lunches.  *Id.*

Mr. Wilkinson stated he reported the problem to Mr. Payan, who "was seemingly very non-concerned about the situation," *id.* at 386, and "said don't worry about it, we'll get them paid," *id.* at 384.  Mr. Wilkinson also said that after Mr. Payan spoke with Mr. Braham, Mr. Payan informed the supervisors they "needed to talk about the situation," "get [their] story straight," and "report that it was just a communication and process problem," and that "[they'd] be okay[] as long as [they stuck] to the story."  *Id.* at 386.

Supervisor Doug Mason's written statement explained that "[i]n March in a morning planning meeting . . . it was mentioned that full lunches would be changed in the driver timecards."  *Id.* at 387.  Mr. Mason recalled Mr. Payan saying, "Don't worry about

---

[5] Mr. Payne's written statement did not specify who gave him this instruction.

9

it, we'll be fine." *Id.* Mr. Mason also stated that after Mr. Scott reported the timecard problem to Mr. Braham, "[Mr. Payan] wanted to change the narrative to reflect more communication on his part." *Id.* He described, "On Friday morning[,] April 24th[,] . . . [Mr. Payan] instructed us on his narrative[,] saying, '[Mr. Scott] simply didn't report back the details of the lunch report and the supervisors didn't follow up with the drivers.' He . . . told each of us to say 'okay' to his plan." *Id.*

### iii. HR's GTS investigation

Mr. Braham reported the results of his preliminary investigation to HR, which launched a formal investigation. HR assigned Lisa Cerqueira, an Employee Relations Manager, to interview Mr. Payan and multiple UPS employees, including Mr. Scott, Mr. Williams, Mr. Payne, and Mr. Mason.

Ms. Cerqueira interviewed employees between May 26 and 28, 2015. During these interviews, UPS employees corroborated their earlier written statements. For example, Mr. Mason reiterated that Mr. Payan mentioned in a morning meeting that Mr. Scott was changing timecards. He also reported that Mr. Payan instructed supervisors to tell Mr. Braham that "there was a lack of communication." *Id.* at 390. Mr. Scott likewise echoed his earlier written statement that Mr. Payan specifically instructed him to alter timecards to reflect lunch breaks. *See id.* at 397. He added, "I only started doing [timecard changes] because [Mr. Payan] told me to do so." *Id.* at 398. Mr. Scott confirmed that Mr. Payan instructed the supervisors to "stick to [the] story" and added, "[Mr. Payan] met with all of us and told us what we should say to [Mr. Braham]. He then

10

pointed at each of us and said[,] '[O]kay?' He did this with every person in the room." *Id.* at 399.

In addition to the supervisors working under Mr. Payan, Ms. Cerqueira interviewed several UPS business managers to determine how others in Mr. Payan's role handled timekeeping and lunch breaks. One business manager explained that every day he reviewed a copy of the "'No Lunch' report" and instructed supervisors to speak with any drivers who skipped lunch. *Id.* at 413. The business manager stated, "We would not make a change to a driver's timecard without the driver's approval. I would be surprised if any of the other manager's [sic] did anything different." *Id.*

Another business manager explained that he received a daily email report of the drivers who had not taken a lunch break. *Id.* at 414. Though "[i]t [had] been a long time since [he] physically audited [a driver's timecard]," he explained that "[i]f a driver did not take a lunch[,] [he] would print off the driver's timecard[,] [h]ighlight there was no lunch[,] [and] [f]ollow up with the driver." *Id.*

A third business manager, Cindy Holcomb, admitted that she previously instructed her supervisors to enter in a lunch for drivers who did not take the required break but said, "The next morning we would review this . . . and [emphasize] that [the supervisors] needed to follow up with the driver to validate the correction was correct." *Id.* at 415. She also stated that she had changed her process: "[N]ow . . . I print the no lunch report and give it to the sup[ervisors] on the days we have an exception. The sup[ervisor] will

11

go to the driver and get the exact time they took the lunch and have them sign [it as] being corrected and then we file it." *Id.*

Finally, Ms. Cerqueira spoke with Mr. Payan, who insisted he "did not instruct anyone to change timecards." *Id.* at 407. Mr. Payan instead attributed the timecard problems to a "[b]reakdown in communication." *Id.* at 405. He denied coaching members of his management team on how to respond to Mr. Braham and claimed he never instructed employees to "[s]tick to the story." *Id.* at 408.

c. *PTRS timecard investigation*

In June 2015, one of Mr. Payan's employees told another business manager that she underreported hours to avoid overtime. The employee also admitted she kept track of her extra time because she expected "she would be given a day off later to help compensate her." *Id.* at 419. The business manager reported the problem to HR Operations Manager Darren Moore, who began a formal investigation. Mr. Moore instructed another HR employee to collect and review the relevant PTRS worksheets. This review revealed that at least five employees worked overtime they did not record. It also showed that Mr. Payan edited two employees' timecards "to adjust what was originally input by [the] employee[s]." *Id.* at 420; *see also id.* at 421-38.

Mr. Moore instructed Mindi Justet, an HR supervisor, to interview witnesses. During these interviews, one employee explained that "[Mr.] Payan told [her] if [she] went over hours [she] could take off hours on [a] different day." *Id.* at 441. Another employee explained that he noticed an alteration on his timecard, confronted Mr. Payan,

12

and "was told he [could] leave early on a different day." *Id.* at 445. The employee stated that "[Mr. Payan] [had] told him to code 8 hours and the remainder hours on another day." *Id.* at 446. The employee also told Ms. Justet that Mr. Payan altered his timecard while he was on vacation and that "[t]his ha[d] been a practice from the beginning of his career." *Id.*

d. *July 2015 discipline*

Mr. Braham and Ms. Cerqueira sent Mr. Moore copies of the employee statements and interview notes from their GTS investigation. Ms. Cerqueira also sent a typed summary of her findings.[6] After reviewing these files, Mr. Moore "determined that [Mr. Payan] had violated UPS policy and that discipline was warranted, including loss of pay and stock." *Id.* at 548. Mr. Moore decided to defer discipline until after the PTRS investigation concluded, but he discussed his decision with Ken Cherry, the District President, and received approval for the disciplinary action.

Soon after, Mr. Moore received the documents and interviews from the PTRS investigation. After reviewing these files, Mr. Moore instructed Carolee Streeper, the

---

[6] Mr. Payan claims that "[d]espite her past practice of creating a summary of her investigation[s]," Ms. Cerqueira "did not complete [an executive summary] for the investigation into Mr. Payan," Aplt. Br. at 16, but a copy of Ms. Cerqueira's summary email is included in the record, *see* App. at 1064. Because Mr. Payan's statement is "blatantly contradicted by the record," *Scott v. Harris*, 550 U.S. 372, 380 (2007), we do not accept his assertion that Ms. Cerqueira did not create an executive summary for her investigation.

13

Utah Area HR manager, to document the findings from the GTS and PTRS investigations, write a disciplinary notice, and deliver it to Mr. Payan. The notice read:

> The investigation surrounding the timecard integrity violation has concluded. The investigation found the actions directed by Chuck Payan, Wasatch Business Manager, violated the integrity policy. Specifically, his actions were improper in timecard preparedness and adjustments.
>
> It is the responsibility of business manager Chuck Payan to maintain control of all tasks, policies, procedures, performance and methods of conducting business within the Wasatch package center and any other area within Mr. Payan's responsibility. Additionally, Mr. Payan is responsible for the effective communication of these responsibilities to his management team and understands that he must provide appropriate direction to his team to maintain integrity of all processes and procedures. If Mr. Payan does not have a clear understanding of any directive, policy or procedure he must bring it to the attention of his direct manager to ensure appropriate comprehension.

*Id.* at 472. The notice also included a copy of the UPS integrity policy and explained that "[a]s a result of violating the integrity policy, Mr. Payan will not receive a raise nor will he receive [stock] for 2015 payable in 2016. In the event there are no further incidents . . . reinstatement of his raise and/or [stock] may be considered." *Id.*

On July 21, 2015, Mr. Braham and Ms. Streeper met with Mr. Payan to deliver the disciplinary notice. They made clear that Mr. Payan was being disciplined for both GTS and PTRS timecard issues, *see id.* at 795, and because his "production numbers and safety numbers [weren't] where they should be," *id.* at 795-96.

14

UPS also disciplined Mr. Scott by requiring him to "re-certif[y] in both PTRS guidelines . . . as well as GTS guidelines, on the proper recording of lunches and proper recording of time." *Id.* at 726.

e. *UPS's justifications for Mr. Payan's discipline*

Throughout discovery, UPS maintained, consistent with the disciplinary notice and meeting, that it disciplined Mr. Payan for his timecard violations. For example, when asked in an interrogatory to "[d]escribe the circumstances that were the impetus for Mr. Payan being investigated and ultimately disciplined in 2015," *id.* at 360, UPS responded with a lengthy explanation of the GTS and PTRS issues. UPS also explained "[i]t is contrary to UPS's integrity policy for supervisors or managers to change the GTS or PTRS time entry for any of their employees without the employees' permission," and that "pursuant to UPS policy[,] supervisors and managers are prohibited from permitting employees to under-report their hours, or to permit additional time off, discretionary days or additional vacation days in lieu of accurate time recording." *Id.* at 361.

UPS also emphasized Mr. Payan's timecard violations during its 30(b)(6) deposition. When Mr. Payan's counsel asked why the disciplinary notice did not contain "specifics as to what he had done wrong," UPS said, "Because it all rolled up [in]to the same issue. The issue was an integrity violation." *Id.* at 759. Mr. Payan's counsel asked "[w]hat UPS [meant] by that," to which UPS responded:

> It was found that he was directing Jake Scott and Brad
> Williams to make these timecard entries. That's number one,
> which is against policy, because [UPS] . . . did not have
> authorization to change those timecards. It was also found

. . . through multiple witnesses, that he, [in] a meeting afterwards, when confronted, . . . told his supervisors to influence their testimony to say that it was a communication problem. So this is in violation of the integrity policy, for trying to cover up the facts.

*Id.* at 609.

UPS acknowledged that Mr. Payan's disciplinary notice was brief but explained this was because "the decision makers didn't feel it was necessary to point out every single infraction." *Id.* at 759. It added, "[W]hat's documented in [the disciplinary notice] is the umbrella of integrity . . . . So ultimately, the basis for the decision . . . was because of his violation of the integrity policy, which it states in there." *Id.*

## C. *Procedural Background*

In December 2015, Mr. Payan sued UPS, Ms. Cerqueira, and Ms. Streeper (collectively, "UPS") for retaliation in violation of 42 U.S.C. § 1981, alleging the 2015 investigation and disciplinary decision were "retaliation for [his] engaging in protected activity by suing UPS [in *Payan I*]." *Id.* at 16. He also brought claims for breach of contract and breach of the duty of good faith and fair dealing.

UPS moved for summary judgment, arguing that (1) the claim-splitting doctrine precluded Mr. Payan's claims, (2) Mr. Payan could not establish a prima facie case of retaliation, and (3) Mr. Payan could not establish pretext. The district court found that the claim-splitting doctrine did not apply and that Mr. Payan had established a prima facie case of retaliation. But it found that Mr. Payan could not "shoulder his burden [to

16

show pretext] under the third prong of the *McDonnell Douglass* [sic] burden shifting test." *Id.* at 1305.

In reaching this conclusion, the district court addressed "four arguments that [Mr. Payan] maintain[ed] support[ed] a finding of pretext." *Id.* at 1300. First, the court rejected Mr. Payan's assertion that "the absence of an executive summary and the use of handwritten interview notes instead of audio recordings" demonstrated that "UPS's investigations [were] a sham." *Id.* The court found that the lack of an executive summary was "immaterial in light of [UPS's] otherwise thorough and detailed investigation." *Id.* It also noted that "Mr. Payan fail[ed] to come forward with . . . any legal requirement that the interviews be tape recorded" and "cite[d] no authority for the proposition that failure to record as part of an employment investigation provides an inference for pretext." *Id.* at 1301.

Second, the court rejected Mr. Payan's argument that UPS offered changing explanations for its disciplinary decision. The court acknowledged that UPS "initially explained it was disciplining Mr. Payan for his violation of [the] integrity policy" but "later added as an additional explanation [Mr.] Payan's improper interference with the [timecard] investigation." *Id.* But it found that the two explanations were "tightly interwoven and interrelated" and were "both . . . consistent with [UPS's] investigative findings." *Id.* at 1302. It further noted that the explanations "reasonably supported only two inferences[:] either UPS disciplined [Mr.] Payan for . . . his improper alteration of drivers' timecards; or . . . for . . . his improper alteration of timecards compounded by . . .

17

his interference with UPS's investigation into that conduct." *Id.* It concluded that any "apparent inconsistency [could not] reasonably support the inference that both the initial justification . . . and the more complete explanation . . . were false." *Id.*

Third, the court rejected Mr. Payan's argument that "he was treated differently than others who were disciplined less harshly for timecard policy violations." *Id.* at 1303. It found "the record [did] not establish that [any other UPS employee] violated work rules of comparable seriousness." *Id.* at 1304. It also concluded "Mr. Payan failed . . . to provide the type and quality of evidence necessary to allow the [c]ourt to adequately support an inference that any . . . other . . . employees were truly similarly situated." *Id.*

Fourth, the court rejected Mr. Payan's assertion that "the temporal proximity between . . . *Payan I* and UPS's employment action shows pretext," noting that "temporal proximity standing alone is insufficient to show a triable issue of fact concerning [pretext]." *Id.* at 1305.

Because it found Mr. Payan's four pretext arguments unpersuasive, the district court concluded he "failed to shoulder his burden [to show pretext] under the third prong of the *McDonnell Douglass* [sic] burden shifting test." *Id.* Accordingly, it granted summary judgment for UPS on the § 1981 retaliation claim.[7]

---

[7] The court dismissed Mr. Payan's remaining contract-based claims as precluded.

18

## II. DISCUSSION

This appeal presents a single issue: whether the district court correctly granted summary judgment for UPS on Mr. Payan's § 1981 retaliation claim. We affirm because we agree that Mr. Payan has not carried his burden to show UPS's stated reasons for discipline were pretextual.[8]

### A. *Standard of Review*

"We review summary judgment determinations de novo, applying the same standard as the district court." *Smothers v. Solvay Chem., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). "We view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 882 (10th Cir. 2018). But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

---

[8] In its reply brief, UPS urges us to affirm on the alternative ground that Mr. Payan's lawsuit is barred by the claim-splitting doctrine. Because the district court's judgment was favorable to UPS, UPS did not need to raise this argument in a cross-appeal. *See United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633 F.3d 951, 958 (10th Cir. 2011) (cross-appeal not necessary when appellee urges alternative ground to affirm); *see also El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999) (cross-appeal not required when appellee "urge[s] in support of a decree any matter appearing in the record"); *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 155 (4th Cir. 2012) ("A cross-appeal is unnecessary where an appellee seeks nothing more than to preserve a judgment in its favor." (alterations and quotations omitted)); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. W. Lake Acad.*, 548 F.3d 8, 23 (1st Cir. 2008) ("A cross-appeal is generally not proper . . . when the ultimate judgment is favorable to the party cross-appealing."). We do not address the claim-splitting argument because we choose to affirm on the same ground on which the district court granted summary judgment.

could believe it," we do "not adopt that version of the facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit." *Smothers*, 740 F.3d at 538 (quotations omitted). "A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.* (quotations omitted).

B. *Legal Background – Pretext*

This case requires us to apply the *McDonnell Douglas* burden-shifting framework described above. The parties do not dispute that Mr. Payan carried his initial burden to establish a prima facie case of retaliation. *See Twigg*, 659 F.3d at 998 ("[T]he plaintiff must first make out a prima facie case of retaliation . . . ."). They also do not dispute that UPS articulated a "legitimate, nonretaliatory reason" for its disciplinary decision. *Id.* Accordingly, "[t]he basis for this appeal is the district court's determination that [Mr.] Payan did not provide evidence of pretext sufficient to send his claims to a jury." Aplt. Br. at 35; *see also* Aplee. Br. at 30 (noting that Mr. Payan challenges only the district court's determination that he did not demonstrate pretext).

The following provides an overview of the pretext step of the *McDonnell Douglas* analysis and describes three ways a plaintiff can establish pretext:[9] (1) inconsistent or implausible explanations for discipline, (2) deviation from company policy or protocol, and (3) disparate treatment of similarly-situated employees.[10]

1. **Pretext, Generally**

"A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *DePaula*

---

[9] These are not the only ways a plaintiff can demonstrate pretext. *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007) ("A plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." (brackets and quotations omitted)). We focus on these three categories because Mr. Payan relies on them for his pretext arguments.

[10] On appeal, Mr. Payan argues that UPS demonstrated pretext by (1) providing inconsistent explanations for his discipline, (2) acting in bad faith, and (3) treating him differently than similarly-situated employees. *See* Aplt. Br. at 35-47. The term "bad faith" does not often appear in § 1981 cases. When it does, it is used as an umbrella term or synonym for pretext. *See, e.g.*, *Piercy v. Maketa*, 480 F.3d 1192, 1201 (10th Cir. 2007) (discussing the quantum of proof "that must be shown for a trier of fact in a discrimination claim to reasonably infer that an employer is acting in bad faith to cover up a discriminatory purpose"); *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (quotations omitted) (noting that a finding of pretext is not warranted where an employer "honestly believed those reasons and acted in good faith upon those beliefs").

Because bad faith is not a specific type of pretext, we do not provide separate legal background for Mr. Payan's bad faith arguments. Instead, we focus on the conduct he discusses to suggest that UPS acted in bad faith. He first argues that various employees demonstrated bad faith by investigating him even though they lacked plausible grounds to do so. *See* Aplt. Br. at 41-43. We address this argument alongside his allegations that UPS offered inconsistent or implausible explanations for his discipline. Mr. Payan also argues UPS demonstrated bad faith by "engag[ing] in procedural irregularities" and deviating from its company policies. *Id.* at 44. We address this argument in our discussion of UPS's alleged deviations from company policy and protocol.

*v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (quotations omitted). Often this is accomplished by "demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action[s] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Anderson*, 181 F.3d at 1179 (quotations omitted). "Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *Id.*

When assessing pretext, "we must consider the evidence of pretext in its totality." *Fassbender*, 890 F.3d at 884. In doing so, "we examine the facts as they appear *to the person making the decision* and do not look to the plaintiff's subjective evaluation of the situation." *DePaula*, 859 F.3d at 971 (quotations omitted); *see also Selenke*, 248 F.3d at 1261 ("[W]e examine the facts 'as they appear to the person making the decision to terminate [the] plaintiff.'" (quotations omitted)); *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209 (10th Cir. 1999) (courts should look to the manager's perception of the employee's performance, not plaintiff's subjective self-evaluation), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98-102 (2003). "Instead of asking whether the employer's reasons were 'wise, fair[,] or correct,' the relevant inquiry is whether the employer 'honestly believed those reasons and acted in good faith upon those beliefs.'" *DePaula*, 859 F.3d at 971 (quoting *Swackhammer*, 493 F.3d at 1170); *see also Rivera*, 365 F.3d at 924-25; *Selenke*, 248 F.3d at 1261.

22

## 2. Inconsistent or Implausible Explanations for Discipline

A plaintiff can establish pretext by showing that an employer was "inconsistent in the reasons it provided for the [employment decision]." *Whittington v. Nordam Grp., Inc.*, 429 F.3d 986, 994 (10th Cir. 2005); *see also Plotke v. White*, 405 F.3d 1092, 1104 (10th Cir. 2005) (holding that "the conflicting evidence regarding the reasons [an employer] decided to fire [an employee] raise credibility issues for the fact finder"); *Perfetti v. First Nat'l Bank of Chi.*, 950 F.2d 449, 456 (7th Cir. 1991) (finding of pretext warranted "[i]f at the time of the adverse employment decision the decision-maker gave one reason, but at the time of the trial gave a different reason which was unsupported by the documentary evidence"). "Such inconsistencies include abandoning explanations that the employer previously asserted." *Fassbender*, 890 F.3d at 887.

"On the other hand, there is no support for a finding of pretext if the employer does not give inconsistent reasons, but instead merely elaborates on the initial justification for termination." *Matthews v. Euronet Worldwide, Inc.*, 271 F. App'x 770, 773-74 (10th Cir. 2008) (unpublished)[11]; *see also Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1332 (11th Cir. 1998) (finding no pretext where employer elaborated on, but did not change, the justifications for its employment decisions); *Perfetti*, 950 F.2d at 456 (same).

---

[11] Although not precedential, we find the reasoning of this and other unpublished opinions cited in this order and judgment instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

### 3. Deviation From Company Policy or Protocol

"A plaintiff may . . . show pretext by demonstrating the defendant acted contrary to a written company policy, an unwritten company policy, or a company practice when making the adverse employment decision affecting the plaintiff." *DePaula*, 859 F.3d at 970 (quotations omitted). This showing "requires evidence of not just any procedural shortfall, but of a 'disturbing procedural irregularity.'" *Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 696 (10th Cir. 2008) (unpublished) (quoting *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007)). "The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the substantive reasons given by the employer for its employment decision were pretextual." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) (alterations and quotations omitted). "[R]ather, the employee must present evidence that the employer believed that a relevant company policy existed, and chose to deviate from the policy in spite of that belief." *DePaula*, 859 F.3d at 976 n.25 (quotations omitted); *see also id.* at 976-77 (finding no disturbing procedural irregularities when a plaintiff could not identify any applicable procedure that the employer violated).

### 4. Disparate Treatment of Similarly-Situated Employees

"A plaintiff may show pretext by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Smothers*, 740 F.3d at 540 (alterations omitted) (quoting *Kendrick*, 220 F.3d at 1232). "[A]t summary judgment, the court must

24

determine whether plaintiff has adduced enough evidence to support a finding that the other employee and plaintiff were sufficiently similarly situated to support an inference of discrimination." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (alterations and quotations omitted).

"To be 'similarly situated' to the plaintiff, the other employee must 'share the same supervisor' or decision maker." *Smothers*, 740 F.3d at 540 (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 489 (10th Cir. 2006)); *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (quotations omitted) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."). In addition, "employees who are similarly situated must have been disciplined for conduct of comparable seriousness." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (quotations omitted).

## C. *Analysis*

Mr. Payan alleges that UPS demonstrated pretext by (1) offering inconsistent or implausible justifications for his discipline, (2) deviating from company policy and protocol, and (3) failing to discipline similarly-situated employees. Taking this evidence "in its totality," *Fassbender*, 890 F.3d at 884, and "examin[ing] the facts as they appear[ed] *to* [UPS]," *DePaula*, 859 F.3d at 971, we conclude Mr. Payan has not carried his *McDonnell Douglas* burden to show that UPS's basis for discipline was pretextual. We therefore affirm the district court's summary judgment for UPS.

25

### 1. No Inconsistent Justifications for Discipline

Mr. Payan argues UPS demonstrated pretext by offering vague and inconsistent justifications for his discipline. His arguments are not persuasive.

UPS gave a clear explanation for its disciplinary decision. Mr. Payan's disciplinary notice stated that he violated the company's integrity policy. It also specified that his "actions were improper in timecard preparedness and adjustments." App. at 472. Though brief, this explanation was not vague. It specified exactly which policy Mr. Payan violated and described his offending conduct.

Further, UPS never disclaimed or abandoned its initial explanation. *See Fassbender*, 890 F.3d at 888 (finding pretext where employer "abandoned its original explanations [for discipline] in favor of one [that was] harder to assail"); *Whittington*, 429 F.3d at 994 (finding pretext where employer "asserted rationales . . . that were later affirmatively disclaimed . . . or abandoned in the face of contrary testimony"). Rather, UPS consistently asserted that it disciplined Mr. Payan for violating company timecard practices. UPS did, during discovery, reference Mr. Payan's attempts to influence witnesses and "cover up the facts," App. at 609, but it did not "provide[] [this detail] as a new reason for the [discipline]," *Standard*, 161 F.3d at 1332. Instead, it described Mr. Payan's interactions with witnesses to "elaborat[e]" on his timecard policy violations. *Id.* "Such explanation of a general reason is insufficient to show pretext." *Id.*

In sum, UPS clearly identified the reason for its disciplinary decision. And though it later provided additional detail about its basis for discipline, it did not abandon its

initial justification. Mr. Payan thus cannot show that "[UPS's] proffered reason [for discipline] was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1194 (10th Cir. 2016) (quotations omitted).

2. **No Disturbing Procedural Irregularities**

Mr. Payan also argues UPS did not provide an executive summary of its investigatory findings, did not interview him about the PTRS issues, and "directed a written disciplinary action that provides no specifics as to what [he] did wrong, contrary to UPS'[s] policy." Aplt. Br. at 44. He claims these "procedural irregularities" are "suspect" and demonstrate pretext. *Id.* Again, his arguments are unpersuasive.

To establish pretext, Mr. Payan must show "evidence of not just any procedural shortfall, but of a disturbing procedural irregularity." *Cooper*, 296 F. App'x at 696 (quotations omitted). He must also "present evidence that the employer believed that a relevant company policy existed, and chose to deviate from the policy in spite of that belief." *DePaula*, 859 F.3d at 976 n.25. Mr. Payan has not done this. He has not identified any policy requiring UPS to interview him, and he has not shown that UPS policy mandates a detailed disciplinary notice. *See Riggs*, 497 F.3d at 1119 (no disturbing procedural irregularity where employee provided no evidence that the employer "ha[d] a written policy against terminating an employee without seeking their response to a complaint"); *Cooper*, 296 F. App'x at 696 (no disturbing procedural irregularity where plaintiff could not "identify any policy, written or unwritten, that

27

required [the employer] to interview more or different witnesses"). And aside from UPS's deposition testimony that it created executive summary reports for some previous investigations, *see* App. at 597-98, Mr. Payan has not shown that UPS has a formal policy or procedure requiring executive summaries.

Because Mr. Payan has not shown "that [UPS] acted contrary to a written company policy, an unwritten company policy, or a company practice when making the adverse employment decision," *DePaula*, 859 F.3d at 970 (quotations omitted), his allegations of procedural irregularities do not support a finding of pretext, *see Timmerman*, 483 F.3d at 1122.

### 3. No Disparate Treatment of Similarly-Situated Employees

Finally, Mr. Payan argues UPS demonstrated pretext by treating him differently than similarly-situated employees. This argument is also unpersuasive.

Mr. Payan identifies six UPS employees—Cindy Holcomb, Amy Dillon, Ron Guevarra, Chris Fast, Chad Meier, and Paul Kurtzeborn—as those who "were not disciplined for doing exactly what [he] was accused of." Aplt. Br. at 46. But he has not shown that any of these employees were similarly situated.

"To be similarly situated," these other employees must, at the very least, have "share[d] the same supervisor or decision maker" as Mr. Payan. *Smothers*, 740 F.3d at 540 (quotations omitted). Mr. Payan's decision maker was Mr. Moore. But Mr. Payan

28

has not shown that Mr. Moore acted as the decision maker for Ms. Dillon, Mr. Guevarra, or Mr. Meier.[12]  These employees cannot support Mr. Payan's pretext allegations.

Mr. Payan has not shown that any of the remaining three employees engaged in conduct as egregious as his own.  *See McGowan*, 472 F.3d at 745 ("[E]mployees who are similarly situated must have been disciplined for conduct of comparable seriousness.").  For instance, the record does not show that Mr. Fast personally directed employees to alter time cards, *see* App. at 1111-12, whereas several supervisors testified that Mr. Payan instructed them to do so.  And though Ms. Holcomb instructed supervisors to enter breaks for drivers who did not log the required lunch period, she reviewed any alterations and instructed supervisors to follow up with drivers "to validate the correction was correct."  *Id.* at 415.  Mr. Payan, by contrast, instructed supervisors to falsify timecards without verifying the alterations or confirming that the added lunch time was accurate.  The record also does not show that Mr. Kurtzeborn, Mr. Fast, or Ms. Holcomb ever attempted to influence how other employees spoke to investigators about their timecard practices, but Mr. Payan directed his subordinates to conceal his timecard alterations and "stick to [the] story."  *Id.* at 378, 399.

---

[12] When the district court asked about the decision maker for "the other employees that [Mr. Payan] reference[d] for comparison," App. at 1218, his attorney admitted, "I don't know that we have the actual decisionmaker," *id.* at 1219.  The record, however, shows that Mr. Moore disciplined Mr. Kurtzeborn.  *See id.* at 93.  Because Ms. Holcomb and Mr. Fast reported to the same division manager as Mr. Payan, they, too, were likely subject to Mr. Moore's discipline.  *See id.* at 1218-19.

"[A]t summary judgment, the court must determine whether plaintiff has adduced enough evidence to support a finding that the other employee and plaintiff were sufficiently similarly situated to support an inference of discrimination." *Riggs*, 497 F.3d at 1117 (quotations omitted). Here, the allegedly similar employees Mr. Payan identifies were not subject to the same decision maker or did not commit conduct as egregious as his timecard violations. Mr. Payan has thus failed to show that UPS treated similarly-situated employees differently.

\* \* \* \*

When assessing a contention of pretext at summary judgment, "we must consider the evidence . . . in its totality," *Fassbender*, 890 F.3d at 884, and "examine the facts as they appear *to the person making the decision*," *DePaula*, 859 F.3d at 971. Although we must "view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party," *Fassbender* 890 F.3d at 882, the totality of the evidence here reveals that UPS offered consistent justifications for its disciplinary decision, did not commit disturbing procedural irregularities, and did not treat Mr. Payan differently from similarly-situated employees. There is no evidence to suggest that UPS's "proffered reason [was] factually false," *DePaula*, 859 F.3d at 970, or "unworthy of belief," *Randle*, 69 F.3d at 453. Because of this, Mr. Payan cannot carry his burden of showing that UPS's stated reasons for discipline were pretextual. The district court did not err in granting summary judgment for UPS.

III.    **CONCLUSION**

For the foregoing reasons, we affirm the district court's summary judgment for UPS.

Entered for the Court


Scott M. Matheson, Jr.
Circuit Judge