**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**February 13, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

_____

DALE DIAMOND,

    Plaintiff - Appellant,

v.

W.R. BERKLEY CORPORATION, a
Delaware corporation; BERKLEY
INSURANCE COMPANY,

    Defendants - Appellees.

No. 21-1331
(D.C. No. 1:20-CV-02097-RMR-SKC)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **MORITZ**, and **EID**, Circuit Judges.
_____

Dale Diamond appeals the district court's order granting summary judgment to

his former employer on his claims of age discrimination and retaliation. For the

reasons explained below, we affirm.

**Background**

Diamond was a vice president of underwriting and a product-line leader for

professional liability insurance at Verus Underwriting Managers, an operating unit of

defendants Berkley Insurance Company and W.R. Berkley Corporation.[1] Diamond

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. But it may be cited for its
persuasive value. _See_ Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

[1] For simplicity, we refer to Diamond's former employer as "Berkley."

had decades of experience in the insurance industry, and he began working for Berkley in August 2011.

In June 2019, Marlo Edwards became Diamond's new immediate supervisor. In October 2019, Edwards provided Diamond with a list of tasks to complete and quickly became dissatisfied with his lack of progress. Diamond, for his part, described the task list as "impossible" to complete. App. vol. 1, 139.

Late on November 12, 2019, Diamond emailed Donna Highfill, the vice president of human resources, and asked to speak with her. Highfill replied the next day, and the two spoke by phone. During that November 13 call, according to Highfill's deposition testimony, Diamond expressed his belief that Edwards was attempting to replace him with someone "younger and less expensive." *Id.* at 247. Diamond specifically named Jeff Austin as his potential replacement; he also complained that although he believed he was doing good work, Edwards was not satisfied. According to Highfill's notes from this call, Diamond further suggested that if he was going to be separated from the company, he did not want to "end on a bad note." App. vol. 2, 197. With Diamond's permission, Highfill discussed this conversation with Edwards, and Edwards denied having plans to terminate Diamond's employment. Highfill relayed to Diamond that Edwards "had every intention of helping [Diamond] succeed in his role."[2] *Id.*

---

[2] Highfill also testified that despite Diamond's brief invocation of age-related motivation during the November 13 conversation, she viewed the conversation overall as being more about Diamond "feel[ing] insecure in his job" and feeling that "he was being pushed out." App. vol. 1, 238, 247. Edwards likewise testified that her

On November 25, Edwards asked Diamond (who was based in Denver, Colorado) to travel to her office in Richmond, Virginia for an in-person meeting with her and Highfill to discuss his role and performance. The same day, Diamond received two emails criticizing his performance—one from Edwards about his handling of a broker referral and another from a senior vice president of marketing about his recommendation of a wholesale broker for an appointment.

Later that day, Diamond made a second complaint, stating that he believed he was being retaliated against for making his first complaint. Specifically, Diamond emailed Edwards, copying Highfill, and expressed "surprise [at] the constant written criticism that [he was] receiving." *Id.* at 199. He wrote that he interpreted this criticism as "a pretext for making a record for [his] termination due to [his] age and high salary" and that he would "consider any adverse action taken against [him] to be in retaliation for" his age-discrimination complaint. *Id.* In the same email, Diamond declined Edwards's proposed meeting dates of December 3, 4, 5, or 6, stating that he had oral surgery scheduled for December 3. But according to Diamond's deposition testimony, he was actually in Miami until December 5; and according to the scheduling records of his oral surgeon, Diamond's only appointment that month was

"understanding was that [Diamond] wanted to talk with [Highfill] about . . . increased frustration with working with [Edwards]" because they "weren't necessarily seeing eye to eye or communicating well." App. vol. 2, 108. Because it is not material to our decision, we accept Diamond's characterization of his November 13 conversation with Highfill as his first complaint of age discrimination.

3

a consultation scheduled for December 12. In any event, Diamond proposed an alternative date of December 10.

Edwards forwarded Diamond's November 25 email to Highfill and to Rob Stone, an executive vice president, stating that she planned to call Carol LaPunzina, a senior vice president in human resources, to "advise her [about] what's going on." App. vol. 3, 5. Highfill likewise testified that she "elevated" Diamond's complaints to LaPunzina after receiving his November 25 complaint. App. vol. 2, 147.

Diamond made a third complaint on December 2, in an attachment to an email to Edwards that copied Highfill. This time, Diamond stated his belief that the task list was "a pretext for removing [him] from [his] position due to [his] age and in retaliation for [his] complaining about the age discrimination to . . . Highfill." App. vol. 1, 261. In this email, he also repeated his alleged unavailability to meet from December 3–6 due to a scheduled oral surgery, stated he was also unavailable the week of December 15, and offered the week of January 6.

On December 4, LaPunzina discussed Diamond's complaints with Edwards and Highfill and then later with Stone. Highfill testified that during her meeting with LaPunzina, Diamond's complaints were elevated to LaPunzina, who said that she would take over. But LaPunzina testified that any further investigation was interrupted by a separate issue related to Diamond's performance in issuing a policy to a solo practitioner's law firm.

By way of background about this separate issue, in October 2019, an independent insurance broker, Stephen Sylvester, contacted Diamond to request a

policy for the law firm. Diamond initially declined, citing the frequency of claims filed by the firm, the nature of the firm's work, and the firm's location. Sylvester asked Diamond to reconsider, explaining that the firm worked with difficult clients and was overly cautious in submitting more claims than necessary; he added that the firm's "clientele may not necessarily have all their marbles all the time[,] so they tend to say crazy things . . . which [are] interpreted as potential for a claim when [they are] really probably not." App. vol. 4, 23. Sylvester's explanation apparently changed Diamond's mind, and on October 15, he offered quotes for two different types of policies: a traditional policy that would be effective when issued or a more expensive policy with retroactive coverage. Nearly a month later, Sylvester replied in a somewhat ambiguous manner but apparently meant to accept the retroactive coverage. Even though Diamond's colleague pointed out this ambiguity, Diamond simply issued a traditional policy without retroactive coverage, effective November 21.

On December 3, the law firm filed a claim with Berkley based on a lawsuit filed against the firm on November 22, one day after the policy's effective date; the lawsuit alleged failure to comply with fiduciary duties in August and September 2019. On December 4, Berkley told the insured it would be denying the claim because the alleged breach predated the traditional policy's effective date.

Less than an hour later on December 4 (the same day that LaPunzina met with Edwards and Highfill about Diamond's discrimination and retaliation complaints), Sylvester contacted Diamond about this denial, stating that (1) the "policy was

5

supposed to include the retro[active] coverage" that the law firm had paid for and (2) this claim should have fallen within the retroactive coverage. *Id.* at 18. Sylvester asked Diamond to correct the error and issue the requested retroactive coverage. Diamond responded less than 20 minutes later, noted that this "was [his] mistake," and concluded that he needed to amend the policy. *Id.* at 22. He made the change within the same hour, issuing an endorsement that provided retroactive coverage back to October 5, 2016. Diamond took this action independently, without contacting Edwards or anyone in the claims department, knowing that the law firm had a claim pending. And he did so despite knowing Berkley's underwriting guidelines provide that "[c]overage should never be put in place retroactively without a no-loss statement or other evidence of past loss history." *Id.* at 37.

Berkley's claims department learned of the retroactive amendment the next day, when the insured resubmitted its claim and attached the endorsement.[3] The claims department then notified Edwards.

On December 6, Edwards and a Berkley claims executive met with Diamond to discuss his decisions related to the law-firm policy. In an email following up on this meeting, Diamond "apologize[d] for the error of being a bit too accommodating with this broker who was looking for help with a difficult risk" and stated that "the best course of action would have been to stick with the decline" or "at most offer[]" traditional coverage. *Id.* at 43. He also conceded that he had initially issued the

---

[3] Berkley eventually denied the law firm's claim on other grounds later that month.

wrong policy; he attributed that error in part to a "missing comma" in Sylvester's instructions and said that he had been "trying to do too many things at once and going too fast." *Id.*

On December 9, Edwards forwarded Diamond's December 6 email to Stone, Highfill, and LaPunzina. Edwards detailed the problems with the law-firm policy and expressed serious concerns about Diamond's judgment, concluding that she had "never seen something like this take place," that she "certainly wouldn't expect this from" someone in Diamond's position, and that it "raise[d] more questions and concerns." *Id.* at 41. Edwards decided to terminate Diamond's employment, with the support of Stone, LaPunzina, and Highfill.

Berkley formally terminated Diamond's employment on January 3, 2020, citing the incident with the law firm's insurance policy. Diamond was 60 years old. Berkley later promoted Austin, who was 52 years old at the time, to fill Diamond's position.

Diamond then filed this action, bringing claims of age discrimination and retaliation under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634. The district court granted Berkley's motion for summary judgment on both claims. Diamond appeals.

**Analysis**

"We review the district court's order granting summary judgment de novo, applying the same standard as the district court." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 882 (10th Cir. 2018). Summary judgment is proper so long as

7

"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if a rational jury could find in favor of the nonmoving party on the evidence presented." *Fassbender*, 890 F.3d at 882 (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)).

We view the evidence presented at summary judgment in the light most favorable to the nonmoving party; we also draw reasonable inferences in favor of the nonmoving party. *Id.* But for a nonmoving party to defeat summary judgment, it must produce competing evidence that is "based on more than mere speculation, conjecture, or surmise." *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)).

## I.    Age Discrimination

Diamond first argues that his age-discrimination claim survives summary judgment. The ADEA prohibits age discrimination in employment, making it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "A plaintiff can show intentional discrimination either by direct evidence of discrimination or by indirect evidence." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969 (10th Cir. 2017). The parties here agree that this case involves only indirect evidence, placing it within the "the three-part burden-shifting framework

8

articulated in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]." *DePaula*, 859 F.3d at 969.

At the first step of this framework, the plaintiff must establish a prima facie case of wrongful termination. *Id.* At the second step, the employer "must articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the employer does so, then the plaintiff at the third step must demonstrate by a preponderance of the evidence "'that the employer's justification is pretextual,'" meaning that the justification is "not the true reason for the employment decision." *Id.* (quoting *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 540 (10th Cir. 2014)).

Applying this framework, the district court assumed that Diamond had established a prima facie case. It then concluded that Berkley had advanced a legitimate, nondiscriminatory reason for terminating Diamond's employment: his mishandling of the law-firm policy. In particular, the district court noted that it was undisputed that Diamond apologized for changing his mind and issuing the policy in the first place, admitted his mistake in issuing the policy without the requested retroactive coverage, and failed to comply with Berkley's guidelines on retroactive coverage when he issued the policy amendment to correct the issuing mistake. And at the third step, the district court determined that Diamond failed to present any admissible evidence that Berkley's proffered justification of Diamond's mishandling of the law-firm policy was mere pretext for age discrimination.

On appeal, Diamond challenges only the district court's pretext analysis. Indeed, Berkley "has conceded for purposes of summary judgment" that Diamond

has met his prima facie burden at the first step.[4] Aplee. Br. 19. And Berkley has met its "exceedingly light" burden of proffering a facially legitimate and nondiscriminatory reason for terminating Diamond's employment—his handling of the law-firm policy. *DePaula*, 859 F.3d at 970 (quoting *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 899–900 (10th Cir. 2017)). We therefore focus our analysis on pretext.

"A plaintiff may show pretext by demonstrating the 'proffered reason is factually false,' or that 'discrimination was a primary factor in the employer's decision.'" *Id.* (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013)). A plaintiff can accomplish this "by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id.* (quoting *Tabor*, 703 F.3d at 1218). When "'determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*,' and [we] 'do not look to the plaintiff's subjective evaluation of the situation.'" *Id.* at 971 (quoting *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011)). In other words, "[w]hen reviewing for pretext,

---

[4] For this reason, we do not address the parties' various arguments about the precise ages of Diamond, his replacement, and the various decision-makers—such considerations are more typically treated as part of a plaintiff's prima facie case, which we assume exists here. *See, e.g.*, *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (finding age difference between new hires and plaintiffs sufficiently substantial to show replacement by younger employees as part of plaintiffs' prima facie case of age discrimination).

'[w]e are mindful we must not sit as a superpersonnel department that second-guesses the company's business decisions, with the benefit of twenty-twenty hindsight.'" *Frappied*, 966 F.3d at 1059 (quoting *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 813–14 (10th Cir. 2000)).

Diamond first argues that he can show pretext because Berkley's proffered reason for terminating his employment is false: He insists that he did not mishandle the law-firm policy. Yet in his opening brief, he admits that he initially issued the wrong policy to the law firm. And this is consistent with the record evidence, which includes emails from Diamond acknowledging that issuing the wrong policy "was [his] mistake," App. vol. 4, 22, and that he had "misinterpret[ed]" Sylvester's instructions on which policy to issue, *id.* at 43. Diamond now attempts to minimize the importance of this error, contending that it "was the *one and only* minor mistake or 'human error'" he made. Aplt. Br. 24. But Diamond's subjective position on the relative importance of the mistake does not establish a genuine issue of material fact as to whether he mishandled the law-firm policy. *See DePaula*, 859 F.3d at 971 (explaining that we look at facts from perspective of decision-maker, not plaintiff's subjective view).

Moreover, Diamond fails to point to any record evidence to support his related position that Berkley's reason for terminating his employment was false because issuing retroactive coverage in the absence of a no-loss letter did not violate Berkley guidelines. At best, Diamond points to deposition testimony in which one of Berkley's human-resources employees was unable to identify a specific Berkley

11

guideline that Diamond violated in his handling of the law-firm policy. But a single employee's inability to identify the specific guideline at issue does not change the fact that such a guideline unequivocally exists. Berkley submitted proof of that guideline in its motion for summary judgment. And Diamond admitted knowing about and understanding this guideline. Yet he offers no evidence that he obtained the required no-loss statement before issuing retroactive coverage.[5]

Nor is it relevant that Diamond apparently felt compelled to issue the retroactive coverage to correct his initial and admitted mistake of issuing the wrong policy. On this point, Diamond relies on a single case from the Wisconsin Supreme Court to argue that this correction was legally required. *See Trinity Evangelical Lutheran Church & Sch.-Freistadt v. Tower Ins. Co.*, 661 N.W.2d 789 (Wis. 2003) (holding that insured was entitled to summary judgment on its bad-faith claim against insurer where insurer initially issued wrong type of policy and later denied coverage despite knowing of its initial mistake and that coverage would exist had correct policy been issued). Aside from its lack of precedential authority, *Trinity Evangelical*

---

[5] At oral argument, Diamond argued for the first time that Berkley's standard insurance application form includes the required no-loss statement; thus, Diamond asserted, he did comply with Berkley's guideline. But Diamond could not point to anything in the record to support this argument. In response, Berkley highlighted the lack of record support and contended that a no-loss statement required for retroactive coverage would be more extensive than the boilerplate language included in the standard application form. We need not wade into this issue: Given that Diamond raised this argument for the first time at oral argument, we decline to consider it. *See Murphy v. City of Tulsa*, 950 F.3d 641, 645 n.4 (10th Cir. 2019) (declining to consider new argument because "arguments made for the first time at oral argument are waived" (quoting *Ross v. Univ. of Tulsa*, 859 F.3d 1280, 1294 (10th Cir. 2017))).

is unpersuasive for a more basic reason—it involved an insured's bad-faith claim, not an employment termination based on an employee's issuance of a policy in violation of an employer's internal guideline.

Relatedly, Diamond suggests he didn't violate Berkeley's internal guidelines because he issued the retroactive coverage simply to correct his initial error. In support, he highlights portions of Sylvester's testimony in which Sylvester agreed that "promptly correct[ing] the error" was "the right thing to do" and that Diamond "did a fine job underwriting the account." App. vol. 1, 219, 221, 226. But Sylvester's belief that fixing the error was the correct course of action sheds no light on whether Diamond violated Berkley's guidelines in fixing the error by issuing retroactive coverage without a no-loss statement. Indeed, Sylvester himself refused to speculate on whether Diamond violated Berkley guidelines, stating that he "ha[d] no idea if [Diamond] did something more wrong," other than initially issuing the wrong policy. *Id.* at 226. Sylvester also declined to "speak to" Berkley's decision to terminate Diamond's employment based on his handling of the law-firm policy, explaining that he was "not privy to" relevant "internal Berkley guidelines and directives." *Id.* at 227. Sylvester's testimony therefore fails to create a genuine dispute of material fact as to whether Berkley's legitimate, nondiscriminatory reason for terminating Diamond's employment—that Diamond mishandled the law-firm policy, including

13

issuing retroactive coverage in direct violation of Berkley guidelines—was factually false.[6]

Diamond next attempts to show pretext by alleging various inconsistencies and irregularities in Berkley's actions. He first contends that Berkley's failure to investigate his age-discrimination and retaliation complaints was contrary to Berkley's own guidelines and therefore demonstrates a significant procedural irregularity indicative of pretext. *See Fassbender*, 890 F.3d at 889 (noting that "'disturbing procedural irregularities'" can suggest pretext, provided that they are "somehow related to the decision-maker's discriminatory purpose" (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1220 (10th Cir. 2002))). In support, he points to a general Berkley guideline stating that "[e]very reported complaint will be promptly investigated," App. vol. 2, 172, and asserts that "Berkley never investigated any of Diamond's three ADEA complaints," Aplt. Br. 41.

But given the timing of the unrelated intervening issue with the law-firm policy, Diamond's evidence fails to establish that Berkley violated this general policy. Specifically, the record shows that Highfill both discussed Diamond's complaints with him and appropriately elevated his complaints. In particular, Highfill's notes reflect that she discussed Diamond's first complaint with Edwards and then relayed back to Diamond that Edwards did not intend to terminate his

---

[6] Because we conclude that Sylvester's testimony does not create a genuine dispute of material fact, we do not reach Diamond's arguments about whether the district court erred by failing to credit Sylvester's testimony or by making improper credibility determinations at summary judgment.

employment and wanted him to succeed. Additionally, Edwards passed Diamond's second complaint on to LaPunzina, and Highfill likewise testified that she "handed the entire . . . matter over" to LaPunzina on December 4—the same day that Diamond violated Berkley's guideline on issuing retroactive coverage on the law-firm policy (and only about three weeks after Diamond's initial discrimination complaint, just over one week after Diamond's second complaint, and two days after Diamond's third complaint). App. vol. 2, 148. And that the law-firm matter effectively derailed investigation of Diamond's ADEA complaints is neither disturbingly irregular nor indicative of pretext. *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007) (finding no disturbing procedural irregularity in employer's decision to discharge employee based on customer complaint without first interviewing employee "to complete her side of the story"). Indeed, we see no connection between this interrupted investigation and any discriminatory purpose—Highfill adequately elevated Diamond's concerns, but before the investigation could proceed, Diamond's own unrelated conduct intervened. *Cf. Fassbender*, 890 F.3d at 889–90 (finding procedural irregularity could indicate pretext where decision-maker failed to attach narrative to termination paperwork, which allowed her to change her reasons for termination over time).

Next, Diamond argues that Berkley's decision to terminate his employment despite his prior good performance shows pretext, especially when compared to Berkley's decision to promote Austin. *See Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008) (noting that "differential treatment of similarly situated

15

employees" can show pretext (quoting *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008))). But we agree with the district court that Diamond's "prior performance is irrelevant to the question of whether he mishandled the [l]aw[-f]irm [p]olicy" and does not tend to show that Berkley used the law-firm matter as pretext for termination. App. vol. 3, 60. Moreover, Diamond fails to show that he and Austin were similarly situated. Diamond asserts that the law-firm policy eventually resulted in a profit for Berkley, whereas another policy written by Austin resulted in Berkley paying a large claim. But as Berkley points out, the comparison is inapt because Berkley's ultimate profit or loss is not the relevant point of comparison: The relevant point is Diamond's conduct as compared to Austin's. And although Diamond undisputedly violated Berkley's guidelines in connection with the law-firm policy, he does not allege that Austin violated any Berkley guidelines in writing the policy that resulted in a large claim. Indeed, Diamond doesn't challenge Edwards's observation (in deciding to terminate Diamond's employment for his mishandling of the law-firm policy) that she had "never seen something like this take place." App. vol. 4, 41. Thus, Diamond fails to show any disparate treatment that could support pretext.[7]

Diamond next argues that Edwards's prior treatment of him shows pretext. *See Garrett*, 305 F.3d at 1217 (noting that "prior treatment of plaintiff" can show pretext

---

[7] On a related note, Diamond asserts that another Berkley employee—someone who apparently worked under Diamond—also attempted to correct the law-firm policy by issuing retroactive coverage but was not fired for such conduct. We decline to consider this argument because, as Berkley points out, Diamond did not make it below and does not argue for plain error on appeal. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011).

(quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999))). In support, Diamond points to Edwards's performance notes, highlighting that she began compiling those notes the day after his first complaint. Similarly, he points to Edwards's task list and argues she was setting him up to fail.

As Diamond suggests, temporal proximity can be some evidence of pretext. *See DePaula*, 859 F.3d at 976 (noting that temporal proximity, in combination with other evidence of pretext, can support inference of pretext). But here, Edwards based her decision to terminate Diamond's employment on an intervening event—his violation of the company's internal policies—not on the issues included in her performance notes or on Diamond's failure to adequately complete the task list.

Diamond also argues that Berkley's reasons for terminating his employment have shifted over time and were based on subjective criteria. *See Fassbender*, 890 F.3d at 887 (noting inference of pretext can arise "when an employer is 'inconsistent in the reasons it provide[s] for the termination'" (quoting *Whittington v. Nordam Grp. Inc.*, 429 F.3d 986, 994 (10th Cir. 2005)); *Garrett*, 305 F.3d at 1217 (noting that employer's use of subjective criteria can show pretext). But we agree with the district court that Berkley has consistently maintained that it terminated Diamond's employment based on the law-firm matter. Edwards told Diamond as much during his termination call. She advanced the same rationale during her deposition in this litigation. And Berkley continues to assert the same reason on appeal, contending that it "decided to terminate Diamond's employment for his handling of the [l]aw[-f]irm

17

[m]atter in its totality." Aplee. Br. 21. Nor was Berkley's decision based on subjective criteria; Diamond admitted he initially issued the wrong policy, and the guideline Diamond undisputedly violated objectively requires a no-loss statement before issuing retroactive coverage.

Overall, Diamond's proffered pretext evidence, considered together, would not allow a reasonable jury to deem Berkley's reason for terminating his employment "unworthy of credence." *Tabor*, 703 F.3d at 1218 (quoting *Garrett*, 305 F.3d at 1217). Diamond has therefore failed to establish a genuine issue of material fact on pretext, and the district court did not err in awarding summary judgment to Berkley on Diamond's age-discrimination claim.

## II.     Retaliation

Diamond next asserts that his retaliation claim survives summary judgment. The ADEA makes it "unlawful for an employer to discriminate against any of [its] employees . . . because such [employee] has opposed any practice made unlawful by this section." § 623(d). In the absence of direct evidence, as here, a retaliation plaintiff may proceed under the three steps of the *McDonnell Douglas* framework: prima facie case, legitimate nondiscriminatory reason, and pretext. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1201 (10th Cir. 2008).

To establish a prima facie case of retaliation, a plaintiff must "show that (1) he or she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially

18

adverse action." *Id.* at 1202. The district court assumed the first two elements and rejected Diamond's claim based on the third.

"To establish the requisite causal connection between . . . protected conduct and termination, [a plaintiff] must show that [the employer] was motivated to terminate his [or her] employment by a desire to retaliate for [the] protected activity." *Id.* at 1203. "[W]e may infer retaliatory motive from a close temporal proximity between an employee's protected conduct and an employer's adverse employment action." *Id.* at 1204. But "evidence of temporal proximity has minimal probative value in a retaliation case where intervening events between the employee's protected conduct and the challenged employment action provide a legitimate basis for the employer's action." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001–02 (10th Cir. 2011). The district court accordingly concluded that Diamond could not show a causal connection between his complaints of age discrimination and his employment termination because his improper handling of the law-firm policy was an intervening event that broke the temporal proximity between the two events.

On appeal, Diamond again asserts that the temporal proximity establishes the requisite causal connection, emphasizing that Edwards decided to terminate his employment only seven days after his third ADEA complaint and contending that the law-firm matter is not a legitimate intervening event. But his only argument on this front is that Berkley's view of the law-firm matter—that Diamond made a series of mistakes in connection with the law-firm policy, including issuing retroactive coverage without a no-loss statement in violation of Berkley guidelines—is factually

19

false. As we have explained, this argument fails. Diamond's handling of the law-firm policy is therefore a legitimate intervening event that weakens any inference of retaliation based on temporal proximity. *See id.* at 1002 (finding no inference of retaliatory motive where employee had unreported absences after her initial discrimination complaint).

Diamond also argues that he can show a causal connection based on additional evidence. *See Garrett*, 305 F.3d at 1221 (finding causal connection at prima facie stage based in part on "documented evidence of a marked shift in the attitudes and treatment of [employee] by . . . supervisors"). In support, he asserts that Edwards "angrily" confronted him nine days after learning about his first complaint and made him feel that going to human resources was a "mistake" and that he "was in trouble." Aplt. Br. 59. Diamond also points out that Edwards began compiling performance notes after his first complaint and emphasizes that those performance notes commingle issues of his performance and his complaints. But critically, all of these events occurred before the intervening event—and Diamond's handling of the law-firm policy breaks any inference of a causal connection between Edwards's reaction to Diamond's initial complaint and her later decision to terminate his employment. We therefore agree with the district court that Diamond's retaliation claim fails because he cannot establish a prima facie case for lack of a causal connection.

## Conclusion

Diamond fails to create a genuine issue of material fact as to whether Berkley's decision to terminate his employment based on his handling of the law-

20

firm policy was mere pretext for age discrimination, so we affirm the district court's

order granting summary judgment to Berkley on Diamond's age-discrimination

claim. We also affirm the district court's ruling on Diamond's retaliation claim

because Diamond fails to create a genuine issue of material fact as to whether

Berkley's termination decision was causally connected to Diamond's complaints of

age discrimination.

As a final matter, we grant Diamond's unopposed motion to seal.

Entered for the Court

Nancy L. Moritz
Circuit Judge